NO. 84 EMPLOYER–TEAMSTER JOINT COUNCIL PENSION TRUST FUND, on behalf of itself and all others similarly situated, Plaintiff–Appellant,

v.

AMERICA WEST HOLDING CORP.; America West Airlines, Inc.; Texas Pacific Group, Inc.; TPG Genpar LP; TPG Partners LP; TPG Advisors, Inc.; Continental Airlines Inc.; William A. Franke; Richard R. Goodmanson; Ronald A. Aramini; John R. Garel; W. Douglas Parker; Michael R. Carreon; C.A. Howlett; Stephen F. Bollenbach; Frank B. Ryan; John F. Fraser; James G. Coulter; Richard P. Schifter, Defendants–Appellees.

No. 01–16725.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 10, 2002.

Filed Feb. 13, 2003.

Patrick Coughlin (argued), San Francisco, CA; Edward P. Dietrich, Eric A. Isaacson, William S. Lerach, Joseph D. Daley, Daniel S. Drosman, Milberg, Weiss, Bershad, Hynes & Lerach, San Diego, CA; Andrew S. Friedman, Christopher Steiner, Bonnett, Fairborn, Friedman & Balint, Phoenix, AZ, for the plaintiffs-appellants.

Bruce Vanyo (argued), Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA; Michael

R. Klein (argued), Andrew B. Weissman, C. Russell Clause, Wilmer, Cutler & Pickering, Washington, DC; Charles T. Newton, Jr. (argued), Spencer F. Smith, Vinson & Elkins, Houston, TX, for the defendants-appellees.

Before LAY,[*] FERGUSON, and TALLMAN, Circuit Judges.

Opinion by Judge FERGUSON; Dissent by Judge TALLMAN.

## OPINION

FERGUSON, Circuit Judge.

Plaintiffs/Appellants ("Plaintiffs"), shareholders of America West Holdings Corp. ("Holdings"), appeal the District Court's dismissal under Rule 12(b)(6) of their second amended consolidated complaint ("Second Amended Complaint") against Defendants/Appellees Holdings; America West Airlines, Inc.; several America West officers; outside directors; and large shareholders (collectively referred to as "Defendants"). In their Second Amended Complaint, Plaintiffs alleged that Defendants violated section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5,

17 C.F.R. § 240.10b–5. Plaintiffs further alleged that the officers, directors, and controlling shareholders are liable under section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a).

On appeal, Plaintiffs argue that the District Court erred in dismissing their Second Amended Complaint for failure to meet the pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). This Court has jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

### BACKGROUND

Employer–Teamsters Joint Council No. 84 Pension Trust Fund filed a securities fraud class action in the United States District Court for the District of Arizona on behalf of itself and investors who purchased publicly traded Class B common stock of Holdings during the class period (November 19, 1997 to September 3, 1998). Plaintiffs alleged that Holdings and its subsidiary, America West Airlines, Inc. (collectively referred to as "America West"), made misleading statements to artificially inflate the value of America West's stock while their controlling shareholders engaged in insider trading of over $67 million worth of stock.

Defendants in this case are America West, numerous America West officers and directors,[1] and its two largest shareholders during the class period. The

---

[*] The Honorable Donald P. Lay, Senior United States Judge for the Eighth Circuit, sitting by designation.

1. The following Defendants were officers and/or directors of America West: William A. Franke (Chairman and Chief Executive Officer of Holdings and Chairman and Executive Committee member of America West Airlines, Inc.); Richard R. Goodmanson (President and Director of Holdings, and President, Chief Executive Officer, and a Director of America West Airlines, Inc.); W. Douglas Parker (Senior Vice President and CFO of Amer-

ica West Airlines, Inc. and Holdings); C.A. Howlett (Vice President of Public Affairs of Holdings and America West Airlines, Inc.); Ronald A. Aramini (Senior Vice President of Operations of the America West Airlines, Inc.); John R. Garel (Senior Vice President of Marketing and Sales of America West Airlines, Inc.); and Michael R. Carreon (Vice President and Controller of America West Airlines, Inc.).

The following Defendants were outside directors of America West: Stephen F. Bollenbach, Frank B. Ryan, and John F. Fraser.

shareholders were Defendants TPG Partners, L.P.; TPG GenPar, L.P.; TPG Advisors, Inc.; and Texas Pacific Group, Inc. (collectively referred to as "TPG") and Defendant Continental Airlines, Inc. ("Continental"). Defendant James G. Coulter was Director and Vice President of TPG and Director of America West. Defendant Richard P. Schifter was Vice President of TPG and Director of America West.

## A. Factual Background[2]

### 1. Bankruptcy Reorganization of America West

On June 27, 1994, America West filed for Chapter 11 bankruptcy reorganization. Several investors, including TPG and Continental, were involved in the reorganization plan. In return for their equity, the investors received several million shares of Class A and Class B stock, as well as warrants to purchase Class B common stock. Although the economic rights were identical between the two, Class A stock entitled the shareholder to 50 votes per share, whereas publicly-traded Class B common stock entitled the shareholder to one vote per share.

Under the reorganization plan, TPG obtained nearly 800,000 shares of Class A stock, more than 5 million shares of Class B stock, and approximately 1.5 million warrants to purchase additional Class B stock. Consequently, TPG held 49% of the

Class A stock, and Continental held 8.3% of the Class A stock. Both TPG and Continental entered into a Stockholder's Agreement with America West, which contained a "lock-up" provision, requiring that the investors retain two shares of Class B publicly-traded stock for every share of Class A stock until May 20, 1998. Class A stock could be converted to Class B stock at any point.

The Stockholder's Agreement also provided that the shareholders would select nine out of the fifteen board directors.[3] By virtue of their ownership of the "super-voting" Class A stock, TPG and Continental constituted a majority of the stockholders. TPG and Continental allegedly chose directors who were favorable to their interests. For example, Coulter, a TPG officer, was appointed a director of America West and served on its Executive Committee, which exercised all powers of the Board of Directors between the full Board meetings. Schifter, another TPG officer, was also appointed to the Board of Directors and served on the Compensation Committee, which determined the promotion, salaries, and bonuses of American West officers.[4]

### 2. Outsourcing of Aircraft Maintenance & Related Operational Problems

On January 1, 1994, Defendant William A. Franke became Chief Executive Officer

**2.** As required by Federal Rule of Civil Procedure 12(b)(6), the facts are presented in the light most favorable to the Plaintiffs. Under the incorporation by reference doctrine, we also consider documents submitted by Defendants that were referenced in the complaint and whose authenticity has not been questioned. *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir.1999) (quoting *Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir.1994)).

**3.** Plaintiffs argue, both in their complaint and briefs, that these nine were chosen solely by

TPG and Continental. However, the Stockholder's Agreement indicates that the every shareholder who held at least 5% of the voting equity was entitled to choose these nine directors. Plaintiffs' implicit argument appears to be that TPG and Continental exercised de facto control because they controlled the majority of voting equity.

**4.** Plaintiffs allege that three out of the four directors on the Compensation Committee were designated by TPG and Continental by virtue of their majority voting power.

("CEO") of America West. Plaintiffs allege that aircraft maintenance deteriorated dramatically during his term as CEO and later as President of the company. Plaintiffs assert that Franke instituted a policy known as "don't gold plate the plane" (i.e., maintenance workers should only do the minimum) and discontinued "open-door" and "self-disclosure" practices with the Federal Aviation Administration ("FAA").

In December 1995, America West fired 375 aircraft mechanics, half of the maintenance work force, and out-sourced its maintenance to Tramco. In an internal email dated June 22, 1998, an FAA officer described the "maintenance saga" that began in December 1995. The FAA officer stated that "Tramco was not properly doing maintenance" and that the FAA was fighting an "ongoing battle to educate [the] upper management" of America West that it "was, in fact, responsible for oversight." The FAA began an aggressive enforcement program, which included inspections, warning letters, and meetings. Some of these efforts included:

- A December 27, 1995 letter from the FAA to America West stating that Tramco was not in compliance with the Maintenance Policies and Procedures Manual;
- A series of incident reports regarding use of improper lubricant, failure to complete all maintenance check requirements, and operation of aircraft without installation of needed equipment such as hydraulic system pressure lights;
- A February 20, 1996 meeting between Thomas Derieg, America West's Senior Vice President of Operations,

and the FAA to discuss concerns regarding Tramco;
- Subsequent meetings between America West, Tramco, and the FAA regarding Tramco's failure to follow proper procedures;
- A July 18, 1996 FAA report, in which the FAA discussed the results of its "in-depth main base inspection" of America West and cited faulty procedures and multiple violations; and
- A December 10, 1996 FAA letter to Aramini, Senior Vice President of Operations of America West, stating that "Senior Management of America West must understand and take seriously their complete and total responsibility for the administration, oversight, and control of their continuous airworthiness maintenance program."

Throughout 1997, the FAA continued to conduct inspections, find violations, and issue warnings to America West regarding its maintenance operations. In a meeting with America West, the FAA described these maintenance issues as a "systematic problem." America West's "incident rate" [5] was above average for the industry in the second and third quarters of 1997. By the fourth quarter of 1997, the number of Service Difficulty Reports ("SDRs") [6] had increased from 50 to 80 per quarter, in contrast to other major carriers' average of 40 SDRs per quarter.

America West's maintenance issues led to operational problems, including canceled or delayed flights and slower maintenance cycles, and resulted in sub-level perfor-

---

5. "Incident rate" refers to the number of safety-related incidents or occurrences per 100,-000 departures that are associated with an aircraft's operation of an aircraft.

6. The purpose of SDRs is to document a failure, malfunction, or defect in an aircraft that occurs or is detected at any time if, in the carrier's opinion, that failure, malfunction, or defect has endangered or may endanger the safe operation of an aircraft used by it.

mance compared to the S & P index of other airline stocks. For example, America West suffered a third-quarter loss of $45.7 million in 1996. During this quarter, the company's stock fell to $11–1/4, half the previous value of the shares. By October 1997, the stock was trading at about $14 to $15 per share.

Throughout this period, America West assured investors that the maintenance issues were being addressed. In its 1996 Annual Report, the company reported that it had improved its "operational reliability by establishing two new overnight maintenance facilities operations, hiring approximately 60 new mechanics and acquiring an additional spare aircraft," as well as committing additional funds for parts. In June 1997, Goodmanson, then President and CEO of America West, assured investors that the company had "explored in great detail what went well and what went wrong, and we have fixes in place."

### 3. Beginning of Class Period

The low performance of America West's stock obviously affected both its shareholders and officers who held stock options. In response, TPG and Continental allegedly decided to raise the stock price by May 20, 1998, the date on which they could freely sell their publicly-traded stock under the Stockholder's Agreement. To accomplish this goal, TPG and Continental allegedly joined forces to exert undue influence on America West officers, taking advantage of their position as majority owners who controlled the Board of Directors and related committees.

In particular, Plaintiffs allege that, under the influence of TPG and Continental, America West redoubled its efforts to push the stock price higher by peppering the market with false statements about the company's outlook, launching a campaign to secure favorable recommendations from analysts by misinforming them that opera-

tional problems had been fixed, and representing that the improved financial returns were due to exceptionally efficient management, rather than unsafe maintenance practices. Plaintiffs also allege that, in its statements and financial documents, America West overstated its operating income by under-reporting maintenance and repairs expenses.

Some examples of the statements made by America West during this time period include:

- On November 18, 1997, senior management represented to Donaldson, Lufkin & Jenrette ("DLJ") that "bright revenue prospects" were ahead and that the maintenance issues caused by outsourcing were "behind the company." DLJ issued a report the following day.
- On January 20, 1998, America West issued a report, headlined "America West Holdings Corporation Reports Best Financial Results in Company History."
- On January 20, 1998, America West held a conference call with analysts, portfolio managers, and other investors. Franke and Parker, the Chief Financial Officer, discussed the "112% increase in fourth quarter pre-tax income [of 1997]" and indicated that America West's maintenance expenses would not increase in 1998. Following this conference call, Morgan Stanley Dean Witter raised its rating on America West to "out perform."

Contrary to America West's representations, its maintenance problems, as well as the FAA's resulting enforcement actions and warnings, continued to occur. Examples include:

- A January 20, 1998 FAA letter to Goodmanson and related case re-

port, stating that America West's failure to ensure the effectiveness of the two-way radio communication system on airplanes "is indicative of the systemic problems that are deeply integrated within the airline's procedures and/or lack thereof;" and

- A February 9, 1998 FAA letter to Goodmanson and related case report, stating that America West's lack of methods and procedures regarding dispatch releases "perpetuates the attitude of this carrier's management that safety and regulatory requirements are secondary to the continued movement of aircraft within the carrier's route system."

By failing to perform the required inspections and routine maintenance, America West allegedly achieved artificially high utilization rates (i.e., the number of hours flown by an aircraft per day), which in turn increased their revenues. Plaintiffs allege that America West, TPG, and Continental all knew that America West would eventually bear the brunt of these deferred costs.

Plaintiffs also allege that TPG and Continental caused America West to repurchase its own stock as a "manipulative device designed to further inflate its price." During the second and third quarters of 1998, America West spent $87 million repurchasing 4.2 million shares on the open market. In total, America West spent nearly $100 million repurchasing 4.9 million shares.

Plaintiffs assert that the scheme to raise the stock price succeeded by overstating the company's operating income, ignoring maintenance and operational problems, failing to inform investors and the public of its ongoing structural problems, and repurchasing publicly-traded stock. By December 30, 1997, the stock hit $18–7/8, its highest price in 17 months. By March 10, 1998, America West stock reached $27–1/4, the highest price since its bankruptcy reorganization. By April 21, 1998, America West's stock soared to an all-time high of $31–5/16. In the 1997 Annual Report released on May 4, 1998, Franke and Goodmanson stated that America West had "produced the best financial results in its history and realized substantial improvements in its operational performance." The report also emphasized that "safety will continue to be a foremost priority."

From April 23, 1998, to May 6, 1998, several high-ranking America West "insiders," including outside directors Bollenbach, Fraser, and Ryan, sold 101,000 shares at as high as $30–9/16 per stock, netting $3 million in proceeds. As noted earlier, under the Stockholder's Agreement, TPG and Continental could begin selling their publicly-traded Class B stock, without selling any of their supervoting Class A stock, beginning on May 20, 1998. On May 28, 1998, TPG sold approximately 99% of its Class B stock (1,613,586 shares) at approximately $27–3/4 per share, totaling over $44 million. On June 22, 1998, Continental sold all of its Class B stock (317,140 shares) at $28–1/8 per share, totaling over $8.9 million. By the end of July 1998, insiders had sold 2.4 million shares for over $67 million.

### 4. FAA Settlement Agreement

By May 1998, America West had begun secret settlement negotiations with the FAA. In a June 15, 1998 meeting, Goodmanson verbally promised FAA officials that America West would resolve its maintenance problems. The terms of the agreement were discussed in a series of meetings held on June 16, 18, and 24, 1998.

On June 23, 1998, the day after Continental sold its Class B stock, the Wall Street Journal reported that "America West face[d] the prospect of substantial

federal sanctions for failing to properly oversee the work of outside maintenance contractors on its jetliners. The [FAA] is seeking to impose at least $1 million in civil penalties." The article also stated that separate from the prospect of sanctions "the FAA put America West on its 'watch list' June 9 because of labor unrest among maintenance workers and flight attendants.... The airline spokeswoman said the enhanced surveillance hasn't turned up any 'significant maintenance or operational problems.'" On June 24, 1998, the Knight–Ridder Tribune Business News published an article entitled "America West Brass Calls FAA Scrutiny 'Routine.'" In the article, Goodmanson stated that the increased surveillance was "routine FAA procedure" when an airline is involved in labor negotiations, and reiterated that "no significant maintenance or operating problems had been discovered." Plaintiffs allege that these types of reassurances kept the stock value high.

On July 14, 1998, the FAA and America West reached a settlement agreement under which the company agreed to pay $5 million for violating the FAA's aircraft inspection and maintenance rules. The agreement stated that "[b]oth the FAA and America West recognize that organizational changes are required to ensure that America West can conduct such operations at the highest level of safety." Under the terms of the agreement, America West was required to "devise comprehensive corrective actions for problems discovered, at minimum, in the following areas: oversight of contract maintenance; performance of maintenance in accordance with appropriate procedures ...; minimum equipment list compliance, including deferred maintenance; [and] flight/ground training programs...." In carrying out these actions, America West was required to demonstrate that it had sufficient numbers of "experienced maintenance and inspection personnel, quality assurance personnel, ground support personnel, materials, and equipment."

Plaintiffs allege that, during this period, America West continued to reassure the public and its investors that the FAA's actions would not have a negative impact on the company. Goodmanson and other America West officers assured multiple money and portfolio managers, shareholders, and analysts, that America West did not anticipate any major increase in maintenance costs or the cost of oversights. On the day that the settlement agreement was announced, American West issued a statement that "problems cited have been fully addressed" and "that the settlement agreement's provisions will not have a material adverse affect on the Company's operations or financial results." In a July 21, 1998 conference call with analysts, managers, investors, and shareholders, Goodmanson stated that America West was "not anticipating any major increase in maintenance costs or the cost of oversights going forward as a result of [the FAA settlement]." That same day, America West issued a release entitled "America West Reports 80% Increase in Second Quarter Earnings; The Best Quarterly Results in Company History." The operating income was once again overstated by approximately 10% because of the adjusted maintenance costs. Plaintiffs allege that, in reality, America West deferred its maintenance and inspection costs, thus artificially depressing its operating costs in order to maintain higher operating income and to mislead investors.

### 5. Drop in Stock Prices

America West's stock began to decline in late July. The stock value dropped from $29 per share on July 22, 1998 to $21–5/16 on August 4, 1998. The following day, America West announced a new program, authorizing the repurchase of up to five

million shares.[7] In the company's release regarding the new program, Franke stated that it reflected America West's belief that its stock was "an attractive investment."

However, on September 3, 1998, America West announced that it would not meet third quarter earnings estimates because of unsatisfactory operational performance. America West revealed that it was in the process of: (1) purchasing two additional spare airplanes, (2) increasing the number of cities (from four to thirteen) where overnight maintenance capabilities would be available, (3) increasing its inventory of spare parts, and (4) hiring more than 100 mechanics. The stock immediately fell over six points, from the previous day's $20–5/16 per share, to $14 per share on September 3, 1998. The stock continued to fall, reaching a low of $9–5/8 in early October 1998.

Immediately after the September 3, 1998 announcement, analysts slashed the forecast for America West's third and fourth quarters of 1998. Oppenheimer downgraded America West because of "operational disruptions" that were "negatively affecting dispatch reliability, on-time performance and therefore earnings." DLJ Securities issued a report stating that the cause of America West's earnings deficiencies appeared to be "100% operational" and that these problems were the result of ongoing labor issues and "a far more smothering presence of the [FAA] on the 'property' than we had understood." The report noted that "[t]wo disturbing aspects of yesterday's announcement ... were the facts that the current scenario is reminiscent of operationally-related earnings shortfalls in 1996, and that we had no inkling from the company of the problems...."

## B. Procedural History

After the certification of the putative class, Plaintiffs filed a consolidated amended complaint against Defendants, alleging violations of section 10(b) of the 1934 Act and Rule 10b–5. Plaintiffs also alleged that individual officers and directors, as well as the controlling shareholders, were liable under section 20(a) of the 1934 Act.

On October 31, 2000, the District Court granted Defendants' motion to dismiss the consolidated amended complaint with leave for Plaintiffs to amend. The District Court granted Defendants' motion, concluding that "the plaintiffs had failed to satisfy the pleading requirements of the [PSLRA] because (1) plaintiffs had failed to sufficiently support their allegations of false and misleading statements with great detail and all relevant circumstances; and (2) plaintiffs had failed to state with particularity facts that gave rise to a strong inference of deliberate recklessness or actual intent." The District Court admonished Plaintiffs "that another unsuccessful attempt at pleading their claims ... will result in dismissal with prejudice.... Plaintiffs need to focus their complaint on pleading the factual allegations, if any, that support their claims of securities fraud against each defendant named in this action."

On January 8, 2001, Plaintiffs filed their Second Amended Complaint. Plaintiffs alleged that Defendants artificially inflated the price of America West stock by: (1) issuing misleading statements and omitting material information about the company's long-term maintenance and operations problems, as well as the FAA investigation, and (2) causing America West to repurchase millions of shares at $67.8 million. On June 6, 2001, the District Court

---

**7.** As the District Court notes, there is a lack of clarity in the Second Amended Complaint regarding when the multiple stock purchases in the second and third quarters of 1998 occurred.

granted Defendants' motion to dismiss with prejudice for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and failure to meet the heightened pleading requirements of the PLSRA. On June 25, 2001, Plaintiffs filed this timely appeal.

## STANDARD OF REVIEW

A dismissal for failure to state a claim under Rule 12(b)(6) of the Federal Rule of Civil Procedure is reviewed de novo. *Zimmerman v. City of Oakland,* 255 F.3d 734, 737 (9th Cir.2001). All allegations of material fact made in the complaint are taken as true and construed in the light most favorable to the plaintiff. *Burgert v. Lokelani Bernice Pauahi Bishop Trust,* 200 F.3d 661, 663 (9th Cir.2000); *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 983 (9th Cir.1999). A complaint should not be dismissed unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief. *Williamson v. Gen. Dynamics Corp.,* 208 F.3d 1144, 1149 (9th Cir.2000).

## DISCUSSION

On appeal, we must address: (1) whether Plaintiffs have stated a claim against Defendants under section 10(b) of the 1934 Act ("Section 10(b)") and Rule 10b–5, in accordance with the heightened pleading requirements of the PSLRA; and (2) whether Plaintiffs have stated a claim against TPG and Continental under section 20(a) of the 1934 Act ("Section 20(a)"). Because our inquiry is governed by the PSLRA, we begin with a discussion of its requirements.

## A. The Private Securities Litigation Reform Act

In an effort to deter abusive and frivolous securities fraud claims, Congress enacted the PSLRA, which amended the 1934 Act and raised the pleading standards for private securities fraud claims. *Silicon Graphics,* 183 F.3d at 973. The PSLRA altered the pleading requirements for private litigants by requiring that a complaint plead with particularity both falsity and scienter. *Ronconi v. Larkin,* 253 F.3d 423, 429 & n. 6 (9th Cir.2001) (noting that the pre-PSLRA pleading requirement only required that falsity be pled with particularity as required under Fed.R.Civ.P. 9(b)).

■ Pursuant to the PSLRA, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed." 15 U.S.C. § 78u–4(b)(1). In addition, the PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2). In this Circuit the required state of mind is one of "deliberate or conscious recklessness." *Silicon Graphics,* 183 F.3d at 979.[8] However, if the challenged act is a forward-looking statement, the required state of mind is "actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1). If a plaintiff fails to plead either the alleged misleading statements or scienter with particularity, his or her

---

**8.** Our interpretation of the "required state of mind" under 15 U.S.C. § 78u–4(b)(2) is more stringent than that of our sister circuits. *See Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1034 & n. 13 (9th Cir.2002) (collecting cases); *see also Silicon Graphics,* 183 F.3d at 990–96

(Browning, J., concurring in part and dissenting in part) (disagreeing with majority's holding that the PSLRA "eliminated recklessness and motive and opportunity to commit fraud as bases for establishing scienter under § 10(b) and Rule 10b–5").

complaint must be dismissed. *Id.* § 78u–4(b)(3)(A).

## B. Section 10(b) and Rule 10b–5

Plaintiffs argue that the District Court erred in dismissing their claim under Section 10(b) and Rule 10b–5. Section 10(b) states, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use . . . of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 provides that it is unlawful to use any facility of the national securities exchange "[t]o employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b–5(a) (2001). It further provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.* § 240.10b–5(b).

"In considering whether a private securities fraud complaint can survive dismissal under Rule 12(b)(6), we must determine whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] deliberate recklessness made false or misleading statements." *Ronconi*, 253 F.3d at 429 (internal quotation marks and citations omitted) (noting that the pleading require-

ments under the PSLRA can be collapsed into a single inquiry because analysis of both requirements involve the same set of facts).

In evaluating Plaintiffs' Section 10(b) and Rule 10b–5 claim, the District Court found that the Plaintiffs had (1) failed to sufficiently allege any omissions, misrepresentations, or an overall scheme that would form the basis of their securities fraud claim, and (2) failed to raise a strong inference of the required scienter, i.e., that Defendants made these statements or employed such devices with actual intent or deliberate recklessness. Although this Circuit generally examines the falsity and scienter requirements at the same time, we follow the District Court's framework in order to fully discuss the issues raised.

### 1. Sufficiency of Factual Allegations Supporting Claim

▌ Plaintiffs argue that the District Court erred in determining that they failed to sufficiently allege misleading omissions and misrepresentations as required by Section 10(b) and Rule 10b–5. Plaintiffs allege that Defendants schemed to artificially inflate America West's stock price by May 20, 1998, the date on which the major shareholders could freely sell their Class B publicly-traded stock under the Stockholder's Agreement. Plaintiffs allege that, in order to accomplish this goal, Defendants deferred maintenance costs and operational expenses while overstating America West's operating income and making numerous optimistic statements regarding its financial condition. These statements failed to inform investors of America West's continuing maintenance problems,[9] its deferral of maintenance costs,[10] the on-

---

9. For example, during a Merrill Lynch conference on June 8, 1998, America West executives stated that the company had completed or would shortly complete all FAA mandated aircraft inspections quickly with minimal cost and no service disruptions.

10. For example, during a conference call with analysts on January 20, 1998, Parker stated that the company expected that the maintenance expenses for the upcoming year would be about the same.

going FAA investigations, and the settlement negotiations. In addition, Plaintiffs allege that Defendants misrepresented that the original maintenance issues and operational problems caused by its outsourcing to Tramco had been solved.

Plaintiffs further contend that, following the public announcement of the $5 million settlement agreement on July 14, 1998, Defendants made misleading and false statements reassuring investors that America West remained an attractive investment and that the settlement agreement would not have a substantial effect on the company. For example, on the day of the announcement, America West issued a press release, stating that all of the problems cited by the FAA had been fully addressed and that the settlement agreement's provisions would not have "a material adverse effect on the Company's operations or financial results." On July 21, 1998, Goodmanson stated that America West was "not anticipating any major increase in maintenance costs or cost of oversight" as a result of the settlement agreement.

In support of its allegations, Plaintiffs cite to (1) press releases and reports published by America West; (2) statements made by America West officials; (3) America West's financial statements;[11] (4) various correspondence from FAA employees to America West officials; (5) internal email messages between FAA employees discussing the maintenance issues at America West; (6) analyst reports regarding the financial condition of America West; (7) portions of the settlement agreement; (8) comparisons of America West's maintenance and repair costs between 1997 and 1998 and comparisons of inspection costs and aircraft utilization rates with those of other airlines; (9) America West's announcement on September 3, 1998 that it would not meet third quarter earnings because of "unsatisfactory operational performance"; and (10) analyst's reactions to the announcement.

Despite these allegations, the District Court determined that Plaintiffs failed to provide a sufficient factual basis for its fraud claim. In particular, the District Court found that any alleged omissions regarding the maintenance issues, FAA negotiations, and the settlement agreement were immaterial because the market failed to react immediately to the public announcement on July 14, 1998. In addition, the District Court concluded that the Plaintiffs failed to adequately account for the effects of the labor dispute between America West and its maintenance workers during the class period and its effects on America West's third quarter earnings. Because the parties' briefs primarily address the District Court's findings, we discuss each in turn.

---

11. The District Court found Plaintiffs failed to sufficiently allege that America West's financial statements were false or misleading. The District Court focused on Plaintiffs' allegations that America West violated generally accepted accounting principles ("GAAP") and Securities and Exchange Commission ("SEC") rules. It found that the alleged accounting errors did not support Plaintiffs' claims because America West had disclosed its accounting practices to investors and because the statements were certified by a "reputable" accounting.

In doing so, the District Court incorrectly focused solely on one portion of Plaintiffs' allegations. Plaintiffs not only asserted that America West failed to report present maintenance expenses, they also asserted that certain expenses were never incurred because maintenance itself was deferred. By allegedly deferring the maintenance work until after the class period, America West boosted its profits during the class period. Thus, America West's financial statements were allegedly misleading because the company was aware of significant future costs caused by deferring maintenance work, but failed to disclose them to the public.

### a. Materiality of Statements Prior to July 14, 1998

The District Court found that the alleged omissions and misrepresentations regarding America West's maintenance issues, the FAA investigation, and the FAA settlement agreement were immaterial as a matter of law because the market did not immediately react, either after the June 23, 1998 Wall Street Journal disclosure of the potential FAA fines or after the July 14, 1998 announcement that the FAA had levied a $5 million fine. In doing so, the District Court applied the bright line rule suggested by the Third Circuit in *Oran v. Stafford*, 226 F.3d 275 (3d Cir.2000). *Id.* at 282 (finding that misrepresentations or omissions are immaterial as a matter of law if the market does not react immediately upon disclosure of the information).

Defendants urge us to adopt this per se rule, i.e., if there has been no immediate change in the stock price, the alleged misrepresentations or omissions must have been immaterial. However, we decline to do so because adoption of such a rule would contravene the Supreme Court's holdings in *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) and *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

In *Basic*, the Supreme Court expressly adopted the "reasonable investor" standard set forth in *TSC Industries* for determining materiality in the Section 10(b) and Rule 10b–5 context. 485 U.S. at 231–32, 108 S.Ct. 978. The Court held that a fact is material if there is a " 'substantial likelihood' " that a reasonable investor would consider it important in his or her decision making. *Id.* at 231, 108 S.Ct. 978 (quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126). The Court explained that, to fulfill the materiality requirement, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 231–32, 108 S.Ct. 978 (citation omitted). In other words, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Id.* at 240, 108 S.Ct. 978; *see United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir.1991).

Pursuant to *Basic*, we reject Defendants' argument for adoption of a bright-line rule requiring an immediate market reaction. The market is subject to distortions that prevent the ideal of "a free and open public market" from occurring. 485 U.S. at 246, 108 S.Ct. 978 (internal quotation marks and citation omitted). As recognized by the Supreme Court, these distortions may not be corrected immediately. *See id.* at 248 n. 28, 108 S.Ct. 978. Because of these distortions, adoption of a bright-line rule assuming that the stock price will instantly react would fail to address the realities of the market. Thus, we decline to adopt a bright-line rule, and, instead, engage in the "fact-specific inquiry" set forth in *Basic*.[12] *Id.* at 240, 108 S.Ct. 978.

---

**12.** Defendants urge that we extend the "fraud on the market" theory also discussed in *Basic*. 485 U.S. at 246–47, 108 S.Ct. 978. However, Defendants misconstrue the Court's purpose in using this theory. In *Basic*, the Court recognized the difficulty of proving investor reliance on a misrepresentation or omission by a corporation. Thus, the Court created a rebuttable presumption of investor reliance based on the theory that investors presumably rely on the market price, which typically reflects the misrepresentation or omission. *Id.* at 244, 247, 108 S.Ct. 978. However, in crafting this presumption in favor of investors, the Court specifically stated "we do not intend conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in the market price." *Id.* at 248 n. 28, 108 S.Ct. 978.

■ Applying this fact-specific inquiry to the present case, Plaintiffs have sufficiently pleaded the materiality of America West's misrepresentations regarding its maintenance issues, the FAA investigation, and the FAA settlement agreement. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 959–60 (9th Cir.1996) (finding that the company's optimistic statements, which failed to disclose concerns regarding the safety of a product and unlikelihood of agency of approval, were material). A reasonable investor would find significant the information regarding a company's deferred maintenance costs, unsafe maintenance practices, and possible sanction. In addition, a reasonable investor would consider the potential effects of each of these facts on the overall economic health of the company as "significantly alter[ing] the 'total mix' of information made available." *TSC Indus., Inc.*, 426 U.S. at 449, 96 S.Ct. 2126. Moreover, although America West's disclosures of the settlement agreement had no immediate effect on the market price, its stock price dropped 31% on September 3, 1998 when the full economic effects of the settlement agreement and the ongoing maintenance problems were finally disclosed to the market. This reaction, even if slightly delayed, further supports a finding of materiality. This is particularly true because Plaintiffs offer a reason for the delay, i.e., America West continued to reassure analysts that the settlement agreement and compliance therewith would not have noticeable economic effects on the company.[13]

### b. Other Potential Causes

In determining that the Plaintiffs' factual allegations were insufficient, the District Court reasoned that Plaintiffs "completely ignore[d] the other factual events that occurred during the class period and the impact of those events on America West and its stock prices." In particular, the District Court expressed its concern that Plaintiffs had overlooked the labor dispute between America West and its maintenance workers during the class period in determining what factors caused America West to miss its forecasted third quarter earnings.

However, in reaching this finding, the District Court failed to accept Plaintiffs' allegations as true and construe them in the light most favorable to Plaintiffs. *See Silicon Graphics*, 183 F.3d at 983. In their Second Amended Complaint, Plaintiffs pleaded with sufficient particularity its allegations that America West's missed earnings were caused in part by its deferral of maintenance costs and then its later obligation under the settlement agreement to alleviate the problems caused by its unsafe practices. Plaintiffs adequately allege that numerous maintenance issues were caused by outsourcing of maintenance, faulty maintenance procedures and practices, inadequate supervision, lack of spare parts and airplanes, and overutilization of airplanes. Beyond the $5 million fine, Plaintiffs further support their claim by citing to remedial actions taken by America West and statements made by it in the third quarter.

**13.** Based in part on its finding that much of the information was immaterial as a matter of law, the District Court also concluded that Plaintiffs failed to offer support for the allegation that America West continued to have maintenance problems after the July 14, 1998 settlement announcement. However, Plaintiffs adequately alleged that maintenance incidents continued to occur after this announcement. For example, Plaintiffs point to two FAA letters sent to Goodmanson in which the FAA discussed the results of incident investigations.

Moreover, although the lower than expected third-quarter earnings may be partially attributable to the labor disputes, other alleged operational problems cannot be explained solely by this factor. For example, in its September 3, 1998 announcement regarding its third quarter earnings, America West admitted to "unsatisfactory operational performance" and described its purchase of parts and airplanes, its hiring of additional maintenance employees, and its increase in the number of maintenance facilities to address the problems it faced. Contemporary opinions of analysts indicate the labor issues, the FAA's presence due to the company's safety problems, and operational problems contributed to decreased earnings. Although not the sole cause, it appears that the ongoing maintenance issues cited by Plaintiffs may have played a substantial role. Thus, the District Court erred in finding that the existence of other factors, such as the labor disputes, precluded Plaintiffs' argument that systemic maintenance issues also contributed to America West's failure to meet its forecasted third quarter earnings

#### c. Other Arguments

Defendants raise two additional arguments regarding whether Plaintiffs have sufficiently alleged omissions, misrepresentations, or an overall scheme. Specifically, America West asserts that two of its allegedly misleading statements fall within the "safe harbor" provisions of the 1934 Act, while TPG and Continental assert that they are not liable because Plaintiffs failed to specifically plead their involvement in the alleged fraud.

**14.** There are additional requirements for oral forward-looking statements. 15 U.S.C.

#### 1) Safe Harbor Provision

On appeal, America West contends that two allegedly misleading statements are protected under the "safe harbor" provisions of the 1934 Act because they are forward-looking statements. 15 U.S.C. § 78u–5(c)(1)(A)(i). The provisions provide that a person shall not be liable for any "forward-looking statement" that is "identified" as such, and is accompanied "by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." [14] *Id.* A "forward-looking statement" is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions "underlying or related to" any of these issues. *Id.* § 78u–5(i). However, a person may be held liable if the "forward-looking statement" is made with "actual knowledge ... that the statement was false or misleading." *Id.* § 78u–5(c)(1)(B).

■ The two statements for which America West seeks "safe harbor" protection are: (1) the July 14, 1998 America West press release, which disclosed the FAA settlement agreement and fine, stating that "the settlement agreement's provisions will not have a material adverse affect on the Company's operations or financial results"; and (2) the July 21, 1998 conference call with analysts, during which Goodmanson stated, "[W]e are not anticipating any major increase in maintenance costs or the cost of oversights going forward as a result of [the settlement agreement]."

§ 78u–5(c)(2).

We need not reach the questions as to what type of "meaningful cautionary statements" qualifies for safe harbor under the statute because the statements by America West do not constitute "forward-looking" statements. Each is a disclosure of the fine imposed by the settlement agreement for past violations of FAA regulations and a description of the present effects of their imposition on the company. Moreover, even if we were to find them to be "forward-looking," neither statement is accompanied by the requisite "meaningful cautionary statement."

If we allow America West to shield itself from liability based on these statements, any corporation could shield itself from future exposure for past misconduct by making present-tense statements regarding the misconduct and its effects on the corporation.[15] Such blanket protection would eviscerate the 1934 Act altogether.

### 2) Adequacy of Fraud Allegations Against TPG and Continental

■ TPG and Continental both argue that they are not liable under Section 10(b) and Rule 10b–5 because Plaintiffs failed to specifically plead their involvement in the alleged fraud, as required by Federal Rule Civil Procedure 9(b) and the PSLRA. Both parties also note that they did not make any of the allegedly misleading statements. These arguments are unavailing, however, because both TPG and Continental were insiders in the relevant transactions.

■ Section 10(b) and Rule 10b–5 are not limited to misrepresentations or omissions of material fact. They also make it unlawful for "any person directly or indirectly ... [t]o employ any device, scheme, or artifice to defraud ... in connection with the purchase or sale of any security."

17 C.F.R. § 240.10b–5. Trading on material, nonpublic "information qualifies as a 'deceptive device' under § 10(b) ... because a relationship of trust and confidence [exists] between the shareholders of a corporation and those insiders who have obtained confidential information by reason of their position with that corporation." *United States v. O'Hagan,* 521 U.S. 642, 652, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997) (internal quotation marks and citation omitted) (alterations in original) (holding that a person who trades for personal profit, using confidential information misappropriated in the breach of a fiduciary duty, is guilty of violating Section 10(b) and Rule 10b–5). Individuals or corporations that engage in insider trading can be held liable under Section 10(b) and Rule 10b–5. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 386–87, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Thus, the fact that neither Continental or TPG (or its officers) made any of the allegedly misleading statements does not shield them from liability.

### 2. Sufficiency of Scienter Allegations

■ Plaintiffs argue that the District Court erred in concluding that the Second Amended Complaint failed to raise a strong inference of scienter. In this Circuit, the required scienter is "deliberate or conscious recklessness." *Silicon Graphics,* 183 F.3d at 979. Mere motive and opportunity are insufficient. *Id.* Under *Silicon Graphics* and its progeny, we examine all the circumstances in determining whether a strong inference of scienter has been raised. *See id.* at 984–87 (examining the plaintiff's allegations regarding internal reports and stock sales); *see also In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079 (9th Cir.2002) (examining the plaintiffs' al-

---

**15.** Additionally, as shown in the next section, it is arguable that a strong inference of actual knowledge has been raised, thus, excepting these statements from the safe harbor rule altogether.

legations of misrepresentations, accounting manipulations, stock sales, and corporate transactions). Each allegation should be supported by particularized facts and corroborating details. *Silicon Graphics,* 183 F.3d at 985. Beyond each individual allegation, we also consider "whether the total of plaintiffs' allegations, even though individually lacking, are sufficient to create a strong inference that defendants acted with deliberate or conscious recklessness." *Lipton,* 284 F.3d at 1038. In doing so, we must consider "**all** reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs." *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002) (emphasis in original) (discussing the tension between Rule 12(b)(6) and the heightened pleading standard set forth under the PSLRA).

### a. Stock Sales

Plaintiffs allege that numerous individuals and the two controlling shareholders engaged in massive insider trading during a three month time period. In particular, Plaintiffs alleged that four of America West's top officers—Howlett (Vice President of Public Affairs), Aramini (Senior Vice President of Operations), Garel (Senior Vice President of Marketing and Sales), and Carreon (Vice President and Controller)—and three of America West's directors—Bollenbach, Fraser, and Ryan—sold over 167,819 shares for over $4.5 million. Plaintiffs also allege that Coulter and Schifter, both of whom served as officers for TPG and directors for America West, sold 332,733 shares for over $9 million. In addition, Plaintiffs allege that Continental sold 317,140 of its publicly-traded Class B stock (100% of its publicly traded stock) for almost $9 million, based on insider information. Finally, Plaintiffs assert that TPG sold 1,613,586 shares of its publicly traded Class B stock (over 99% of its publicly-traded stock) for

over $44 million, also based on insider information.

The District Court concluded that the stock sales by the officers, directors, and controlling shareholders were not suspicious and failed to raise a strong inference of scienter. As to the individuals, the District Court found it dispositive that none of the officers or directors (outside of Aramini) who allegedly engaged in insider trading made any of the false or misleading statements. As to the controlling shareholders, the District Court found the restrictions imposed by the Stockholder's Agreement rendered the sale unsuspicious. We disagree and find that the allegations raised a strong inference.

" '[U]nusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter . . . ." *Silicon Graphics,* 183 F.3d at 986 (citation omitted). However, insider stock sales are only suspicious when they are " 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.' " *Id.* (quoting *In re Apple Computer Sec. Litig.,* 886 F.2d 1109, 1117 (9th Cir.1989)). "Among the relevant factors to consider are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (citing *Provenz v. Miller,* 102 F.3d 1478, 1491 (9th Cir. 1996)). In addition, "in determining whether the trading pattern is suspicious," we may consider an insider's ability to trade. *Ronconi,* 253 F.3d at 436 (citation omitted).

Before applying these factors to the individual defendants, we note that the District Court erred in summarily dismissing Plaintiffs' argument based solely on the fact that most of the individual officers and directors had not made the alleged misrep-

resentations or misleading omissions. An insider's silence as to the statements is not dispositive. Rather, it is merely another factor that should be considered in determining whether a strong inference of scienter has been raised. *See Vantive*, 283 F.3d at 1094 (considering the defendant's failure to utter a word as one factor); *cf. Silicon Graphics*, 183 F.3d at 987–88.

■ Turning to the relevant factors, the stock sales by individual defendants appear dramatically out of line with their prior trading practices at times calculated to maximize personal benefit from undisclosed inside information. First, the amount and percentage of shares sold by individual insiders was suspicious. Most of the individuals sold 100% of their shares, with the lowest percentage being 88%. The proceeds from these sales totaled over $12 million. For each defendant, Plaintiffs outlined the individual's holdings, his class period sales, when the sales occurred, the percentage of owned shares that were sold, and the total proceeds that were generated from the sale.

| Defendant | Number of Shares Sold | Percentage of Shares Sold [16] | Proceeds from Sales |
|---|---|---|---|
| Aramini | 34,000 | 100% | $1,007,420 |
| Bollenbach | 12,819 | 100% | $ 379,311 |
| Carreon | 10,000 | 100% | $ 296,300 |
| Coulter | 162,592 | more than 90% | $4,518,432 |
| Fraser | 12,000 | 93.6% | $ 363,000 |
| Garel | 66,000 | 100% | $1,779,132 |
| Howlett | 27,000 | 100% | $ 800,010 |
| Ryan | 6,000 | 88% | $ 183,360 |
| Schifter | 170,181 | more than 90% | $4,729,330 |

Although "large numbers [and percentages] do not **necessarily** create a strong inference of fraud," the numbers and percentages presented by Plaintiffs are troubling. *Vantive*, 283 F.3d at 1093 (emphasis added) (holding that, although a sale of 74% was suspicious, a strong inference was not raised because analysis of the remaining factors did not raise suspicion).

Second, the timing of the sales also raises suspicions. Unlike other cases where there were timing gaps between the sales or where only one insider did the trading, here all nine of the individuals' sales occurred in succession over a three month period when America West officials were making optimistic statements regarding the company's financial outlook and reassuring analysts that the settlement agreement would have no economic effect.[17] *Cf. Ronconi*, 253 F.3d at 436 ("One insider's ... sales do not support the 'strong inference' required by the statute where the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made."). Equally troubling is the fact that the stocks were sold between $26–9/16 to $30–9/16 per share, near the stock's peak at $31–5/16, and just prior to the stock's decline to $21–5/16 on August 4, 1998 and subsequent plunge to $14 on September 3, 1998. *Cf. Vantive*, 283 F.3d at 1093–94 (noting that there was no strong inference of scienter when the majority of the shares were sold for $20–$24 per share and the stock price increased for several months, peaking at $39); *Ronconi*, 253 F.3d at 435 (finding no strong inference when insiders "miss[ed] the boat" by selling shares for $53–$56 per share, even though the price ultimately rose to $73).

Third, the prior trading history of each defendant indicates that the sales during the class period was unusual and suspicious. None of the individual defendants sold stocks during the twenty months pre-

---

**16.** This percentage is derived from the common stock and exercised options.

**17.** In fact, most of the individuals sold their shares between April. 23, 1998 and May 6, 1998, including outside board directors Bollenbach, Fraser, and Ryan.

ceding the ten month class period. *See Apple Computer Sec. Litig.*, 886 F.2d at 1117 (examining ten months preceding the ten month class period). Nor did they sell for at least four months following the class period. Thus, the sudden flurry of massive insider trading over this three month period of time, after an extended period of inactivity, appears unusual.

Given the large number and percentages of stocks traded, the timing of the sales, and the prior trading history of each defendant, the stock sales that occurred were clearly "calculated to maximize the personal benefit from undisclosed inside information." *Silicon Graphics*, 183 F.3d at 986. Accordingly, the stock sales by the individual defendants were unusual and suspicious and give rise to a strong inference of scienter.

■ We next examine the stock sales by the controlling shareholders. The number and percentage of shares sold by them and the timing of the sales were suspicious. Plaintiffs allege that TPG sold 1,613,586 shares of publicly-traded Class B stock (over 99% of its Class B stock) at approximately $27-3/4 per share, for proceeds of over $44 million. Plaintiffs allege that Continental sold 317,140 shares of Class B stock (100% of its Class B stock) at $28-1/8 per share, for proceeds over $8.9 million. These sales occurred during the same three month period discussed above.[18] Given the massive volume and the timing of the sales, the first two factors indicate suspicious and unusual trading.

Both TPG and Continental contend, however, that the sales are consistent with their prior trading history, especially in light of the restrictions provided in the Stockholder's Agreement. Our prior decisions have noted that restrictions on an insider's ability to trade are important in determining whether the trading pattern is suspicious. *Ronconi*, 253 F.3d at 435. In *Silicon Graphics*, we held that one reason that an insider who traded 75.3% of his holdings had not engaged in suspicious trading was because he "was **legally forbidden** to trade" for the period before the alleged insider trading. 183 F.3d at 987 (emphasis added). Similarly, in *Ronconi*, we held that the "seven month trading period prior to the class period offered by plaintiffs to prove the defendants['] pattern of trading does not prove much about their trading habits, since they were not able to trade during some or much of that time under SEC regulations." 253 F.3d at 436.

The restriction in this case was clearly less stringent than the prohibitions in *Silicon Graphics* and *Ronconi*. The Stockholder's Agreement required that both TPG and Continental retain two shares of Class B common stock for every share of supervoting Class A stock until May 20, 1998. During the restricted period, both companies could have sold their Class B stock, as long as they maintained the 2:1 ratio. In addition, they could have converted their Class A stock into Class B stock at any point, thus allowing them to sell a greater percentage of stocks prior to the May 20, 1998 expiration of the restriction. Unlike *Silicon Graphics* or *Ronconi*, neither defendant was legally forbidden from selling stock. Thus, the restriction in the Stockholder Agreement does not meaningfully detract from the strong inference of scienter that arises from the massive stock sales.

TPG and Continental's argument that they had engaged in stock sales prior to the class period is equally ineffective in undermining the inference of scienter. Both TPG and Continental argue that

---

18. In fact, Continental sold its stock the day before the Wall Street Journal reported that America West faced the prospect of substantial FAA sanctions.

their prior sales of Class B stock and warrants demonstrate their effort to reduce their equity stake in America West.[19] They assert that the sale of almost 2 million shares in May and June 1998 were merely part of this continuing effort to protect themselves from exposure.

In response, Plaintiffs urge us to limit our review to the ten months prior to the class period, citing to *Apple Computer Securities Litigation*, 886 F.2d at 1117, in which we compared sales that occurred during the ten-month class period with the sales during the ten months preceding. In light of our prior caselaw, we accept this limitation as appropriate. *See id.; cf. Vantive*, 283 F.3d at 1095 (comparing sales during the nine months preceding the fifteen-month class period). Therefore, the only sale relevant to our discussion is TPG's warrant sale to America West in March 1997. Under this analysis, the prior trading history of TPG and Continental indicates that their sales during the class period were suspicious.

However, even without limiting our discussion to the ten months preceding, the sales during the class period appear suspicious. None of the prior sales were comparable to those that occurred during the class period. For example, warrants are merely options, and these warrant sales did not occur on the open market. Rather,

they occurred in a private transaction with America West. The same concern is borne out in the private sales of Class B stock to the underwriters. Because none of the previous sales were comparable to those that occurred during the class period, they are less relevant in determining whether the May and June 1998 sales were unusual.

Viewing the relevant facts in the light most favorable to Plaintiffs, TPG and Continental's sales of stock during the class period appear "dramatically out of line with prior trading practices" and "calculated to maximize the personal benefit from undisclosed insider information," thus supporting a strong inference of scienter. *Ronconi*, 253 F.3d at 435 (internal quotation marks and citation omitted). Although it is possible that the controlling shareholders were trying to limit their equity exposure through their sales in May and June 1998, this is a question for the jury, or at least one that should be explored during discovery.

**b. Knowledge of Ongoing Maintenance Problems**

■ In addition to the suspicious sales, one of Plaintiffs' major contentions is that the individual defendants and controlling shareholders knew of the ongoing maintenance problems and deferred expenses

---

19. In February 1996, TPG sold approximately 2.9 million shares of Class B stock to underwriters, by agreement of the principal shareholders. Continental was also involved in this private transaction, selling 1,358,030 shares of Class B stock. The parties disagree about whether Continental's sale was part of the February 1996 transaction. After reviewing the record, it appears that Continental's sale was either part of the private transaction, as described by Plaintiffs, or a second offering, as discussed by TPG. In TPG's excerpts of record, the Form 4 shows that, in February 1996, Continental sold 1,100,000 shares to underwriters for resale at $19.50, with a discount of $0.93. Thus, after the discount, each

share was sold at $18.57. By contrast, in Continental's excerpts of record, the Form 4 shows a sale of 1,358,030 shares for $18.57 per share. Because the timing and price were identical, we conclude that the Continental sale was part of the same February 1996 transaction.

In addition, both Continental and TPG point to prior warrant sales. In May 1996, Continental sold 802,860 shares of Class B warrants to America West. In March 1997, TPG arranged to sell all of its Class B warrants to America West. Warrants are similar to stock options but are created pursuant to an agreement or contract between parties.

and, thus, knew that the statements to analysts and the public were allegedly false or misleading. In their Second Amended Complaint, Plaintiffs allege that the shortfall in the third quarter of 1998 was caused by both systemic operational problems and the FAA's inspection and investigation of America West, which Defendants hid from investors through misleading statements and omissions while individual defendants and the controlling shareholders engaged in large-scale insider trading.

Plaintiffs proffered the following evidence of Defendants' knowledge of these problems: (1) internal reports (including the identity of the person who directed the preparation of the reports);[20] (2) meetings with the FAA (including the dates, content, and participants); (3) FAA letters to America West regarding the ongoing maintenance problems and the agency's increasing frustration with the company (including the dates, case numbers of the investigations, content, and who they were sent to); and (4) the settlement agreement. They also proffer the following evidence that the problem was severe enough that Defendants must have been aware of it: (1) FAA reports regarding the severity of the problems (including case numbers of the investigations and content); (2) FAA letters describing penalties arising from investigations of specific incidents (including the dates, case numbers of the investigations, content, and to whom they were sent); and (3) charts documenting maintenance difficulties. These charts show the scope and the effects of the deferred maintenance and compare the company's performance to that of other major commercial carriers. The charts also compare the number of maintenance labor hours, the rate of maintenance deferred items, hours spent conducting quality assurance, the amount expended on parts inventory, the amount expended on inspection of airplanes, the failed inspection rate, the aircraft utilization rate, the percentage of on-time arrivals, and the number of FAA enforcement actions.

As required under the PSLRA, Plaintiffs have set forth adequate "corroborating details" and facts to support their allegations. Cf. Silicon Graphics, 183 F.3d at 985 ("It is not sufficient for a plaintiff's pleadings to set forth a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will validate her claim."). Viewing the allegations as a whole, we find that they raise a strong inference that Defendants knew that the maintenance problems were ongoing and, thus, that the statements made by America West officers were false.

Both TPG and Continental argue that the Second Amended Complaint fails to allege any facts showing that either company or any of their officers knew about America West's maintenance issues or communications with the FAA. As to TPG,

---

**20.** In finding that Plaintiffs' allegations did not give rise to a strong inference of scienter, the District Court determined that the internal reports were unpersuasive because they failed to specifically allege the content of the reports. "[A] proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability." *Silicon Graphics,* 183 F.3d at 985; *see Lipton,* 284 F.3d at 1036. We noted that other indicia of reliability could include "the sources of[plain- tiff's] information with respect to the reports, how she learned of the reports, who drafted them, or which officers received them." *Silicon Graphics,* 183 F.3d at 985. Although Plaintiffs have provided some corroborating details regarding the internal reports in this case, they have not provided the content. We note that, although requiring a plaintiff to provide specifics from the reports prior to discovery seems a bit unfair, we are bound by our prior caselaw and give the internal reports little or no weight in our analysis.

this argument is without merit. Two TPG officers, Coulter (Director and Vice President) and Schifter (Vice President), served as members of America West's Board of Directors. The Board held eleven meetings in 1997, of which Coulter and Schifter attended 71% and 65% respectively, and the Board held nine meetings in 1998. Coulter was also a member of the Executive Committee in 1997 and 1998. Schifter served as one of the four directors on the Compensation Committee, which met six times in 1997. In light of these facts and the general allegations set forth above, Plaintiffs provide sufficient and particularized factual allegations that TPG and its officers knew about the maintenance and operational problems and the misstatements made by America West's officers.[21]

However, the issue of whether Plaintiffs have sufficiently alleged scienter as to Continental is more troubling. Plaintiffs allege that: (1) Continental held 8.3% of the Class A stock, making it America West's second largest shareholder; (2) Continental, in conjunction with TPG, was able to select nine of the fifteen board directors and three out of the four directors on the Compensation Committee because of its shareholding power; (3) Continental and America West shared a special relationship because Continental helped America West emerge from bankruptcy; (4) Continental constantly monitored America West's operations by way of conversations and internal reports; and (5) the Form 10–K statement regarding the possibility of influence by controlling shareholders. Alone, these facts may be insufficient to raise a strong inference of scienter. However, in light of the large

sale of stocks discussed above, we hold that Plaintiffs have sufficiently raised a strong inference of deliberate recklessness on the part of Continental. *Accord Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 660 (8th Cir.2001) (finding that, in insider trading cases, the timing of trades shows circumstantial evidence of scienter).

### c. Knowledge of Third Quarter Shortfall

Another premise of Plaintiffs' claim is that Defendants knew that America West would have to spend millions of dollars by the end of 1998 to comply with the July 1998 settlement. The District Court found that Plaintiffs have failed to provide any factual support for this allegation. We disagree.

Plaintiffs provide circumstantial evidence that leads to a strong inference of Defendants' knowledge that the FAA fine imposed in the settlement agreement would be costly. Plaintiffs cite to certified letters that Goodmanson received from the FAA for each infraction that occurred during and prior to the settlement agreement. In June 1998, the FAA sent a letter to Goodmanson, proposing civil penalties of up to $11 million as a result of these investigations. During the settlement negotiations, America West was informed that the maintenance problems caused by the outsourcing had not been solved and that the present problems were extensive. In its briefs, America West admits that it received the FAA investigation file with the full incident reports as early as June 1998. These reports indicate that the

---

21. TPG argues that the issues regarding maintenance, safety, and the FAA investigation and settlement were "purely[ ] management issue[s] that never rose to the level of Board discussions or communications with any shareholders." TPG Br. at 21. This argument is patently incredible. It is absurd to

suggest that the Board of Directors would not discuss either the repurchasing authorization for millions of dollars worth of stock or the FAA investigations or negotiations, especially considering the fact that the FAA had indicated that it was considering penalties of up to $11 million.

FAA had extensive concerns regarding America West's policies, practices, procedures, and the attitude of upper management regarding these concerns. Later, America West agreed to settle for a fine of $5 million, the largest FAA fine in history. Finally, the settlement agreement recognized that "organizational changes are required," and that America West needed to "devise comprehensive corrective actions for problems discovered." These allegations indicate that Defendants were aware that fulfilling its duties under the settlement agreement would be extremely costly.

### d. Motive of America West Officers

■ One of the District Court's overall concerns with Plaintiffs' allegations was that the America West officers who made the alleged misstatements were not the same persons who engaged in insider trading. Thus, the District Court found it illogical that they would make deliberately misleading statements. We disagree.

Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period. *Hanon v. Dataprods. Corp.*, 976 F.2d 497, 507 (9th Cir.1992); *cf. Provenz*, 102 F.3d at 1491 (finding a genuine issue of material fact regarding the scienter of an individual defendant who made many allegedly false and misleading statements, even though he sold a minimal number of shares). In other words, the lack of stock sales by a defendant is not dispositive as to scienter.

Although Franke, Goodmanson, and Parker (the America West officers who made the alleged misstatements) did not engage in insider trading, a strong inference of scienter can be inferred from Plaintiffs' allegations. Plaintiffs assert that Franke, Goodmanson, and Parker

were motivated to inflate America West's financial results and stock prices because their eligibility for stock options and executive bonuses were based principally on the company's financial performance. None of the executive officers received options awards in 1997 for the previous year. In contrast, America West awarded Franke 350,000 options in February 1998 and America West awarded 110,000 options to Goodmanson, 35,000 options to Parker, and 20,000 options to Garel in March 1998.[22] In addition, the Compensation Committee (three out of four of whose members were chosen by TPG and Continental) reviewed all aspects of compensation and promotion of the officers who made the alleged misrepresentations. As controlling shareholders, TPG and Continental could easily choose three of its four members. In fact, as aforementioned, TPG Vice President Schifter was a member of the Compensation Committee. Although "generalized assertions of motive, without more, are inadequate to meet the heightened pleading requirements of *Silicon Graphics* [,]" Plaintiffs have provided specific, particularized allegations. *Lipton*, 284 F.3d at 1038.

Plaintiffs also offer one other possible motive, which we find insufficient to establish scienter. They argue that Franke, Goodmanson, and Parker all knew that America West would become much less profitable once it complied with the FAA mandated requirements and settlement agreement. Thus, they contend that the officers "planned to sell the troubled airline and reap a multimillion dollar windfall under the 'change in control' provisions of their employment contracts and incentive compensation plans." The change in control provisions would have allowed Franke, Goodmanson, and Parker to be paid over $5 million. In support of this allegation,

---

**22.** Garel also sold 66,000 shares of America       West stock for over $1.7 million.

Plaintiffs proffer evidence that, in January 1999, America West had been contacted by several airlines, including United Airlines, regarding the possibility of merger or creation of alliances. The District Court summarily rejected this "golden parachute" argument. We also reject this argument because the allegations are too generalized to establish scienter.

### e. Plaintiffs' Allegations as a Whole

In sum, although recognizing that some of Plaintiffs' allegations are individually lacking, we hold that the allegations in their ·totality are sufficient to meet the stringent pleading standard set forth in the PLSRA. Thus, the District Court erred in dismissing Plaintiffs' claim under Section 10(b) and Rule 10b–5.

### C. Section 20(a)

Defendants TPG and Continental assert that they are not liable as controlling persons under Section 20(a). 15 U.S.C. § 78t(a). Section 20(a) provides joint and several liability for controlling persons who aid and abet violations of the 1934 Act absent a finding of good faith and lack of inducement.[23]

■■■■■ In order to prove a prima facie case under Section 20(a), a plaintiff must prove: (1) "a primary violation of federal securities law" and (2) "that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). "[I]n order to make out a prima facie case, it is not necessary to show actual participation or the exercise of pow-

er; however, a defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation." *Id.*

" 'Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions.' " *Id.* (alterations in original) (quoting *Kaplan v. Rose,* 49 F.3d 1363, 1382 (9th Cir.1994)). "Control" is defined in the regulations as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the **ownership of voting securities,** by contract, or otherwise." 17 C.F.R. § 230.405 (emphasis added).

■■■■ Defendants argue that Plaintiffs cannot meet the prima facie showing that the TPG and Continental are controlling persons under Section 20t(a). Our prior cases suggest otherwise. In *Paracor Finance, Inc. v. General Electric Capital Corp.,* 96 F.3d 1151 (9th Cir.1996), we held that a lender in a leveraged buyout transaction was not a controlling person because none of "the traditional indicia of control," such as having a prior lending relationship, owning stock in the target company, or having a seat on the board, were present. *Id.* at 1162 (affirming grant of summary judgment for the lender). In the present case, all three of these "indicia of control" are present. *Id.* First, ·TPG and Continental had a shareholder relationship with America West, which began in 1994. Second, TPG and Continental

---

**23.** Section 78t(a) provides:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a).

were the largest stockholders of America West, controlling approximately 57.4% of the total voting power. Third, they had the power to elect the majority of the members of America West's Board of Directors and committees established by the Board. In addition, they had some of their own officers seated on America West's Board of Directors. Viewing the evidence in the light most favorable to Plaintiffs, Plaintiffs have established a prima facie showing that TPG and Continental were "controlling persons" under Section 20t(a) pursuant to analysis in *Paracor*.

CONCLUSION

Securities fraud class actions are not all good or all bad. In a large public securities market, dishonest insiders may be able to cover their tracks fairly well, and falsely claim to be as surprised as the ribbon clerks, when they take the market for a ride. Unless reasonable inferences from circumstances suffice to get a case to a jury, the welfare of victimized investors and the integrity of the stock market may be insufficiently protected from deceptive manipulators.

*Ronconi*, 253 F.3d at 428. In this era of corporate scandal, when insiders manipulate the market with the complicity of lawyers and accountants, we are cautious not to raise the bar of the PSLRA any higher than that which is required under its mandates. The District Court's failure to accept Plaintiffs' allegations as true and construe them in the light most favorable to Plaintiffs does just that. The District Court erred in finding that Plaintiffs' Second Amended Complaint failed to raise a strong inference that Defendants made false or misleading statements with actual knowledge or deliberate recklessness. We hold that Plaintiffs sufficiently pleaded a securities fraud claim under Section 10(b) and Rule 10b–5 and established a prima facie showing that TPG and Continental are controlling persons under Section 20t(a).

**REVERSED AND REMANDED.**

TALLMAN, Circuit Judge, dissenting:

The Private Securities Litigation Reform Act ("Reform Act") imposes strict requirements on plaintiffs pleading securities fraud claims. These include obligations to: plead that a defendant "made an untrue statement of material fact"; "specify each statement alleged to have been misleading[and] the reason or reasons why the statement is misleading"; and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(1)–(2). I respectfully dissent from the majority's ruling that the plaintiffs' complaint has met these stringent standards.

I

The majority critically errs by swiftly dismissing the key fact that the revelations of the maintenance problems and FAA settlement had no significant effect on America West's stock price.

On June 22, 1998, America West's stock closed at $28. The *Wall Street Journal* first reported on June 23, 1998, that the FAA was contemplating penalties against America West for its failures in supervising maintenance contractors. This was the first public disclosure of this information. That day, America West's stock *rose* to close at $28 1/8.

The next disclosure of purported material information occurred on July 14, 1998. That day, America West announced that it had reached a compromise with the FAA; paying the FAA $5 million in fines. After this disclosure, America West's stock closed at $30 1/4, higher than the previous day's closing price of $29 15/16.

The last disclosure of allegedly material information occurred on July 20, 1998, when *Air Safety Week* published key provisions of the settlement agreement between the FAA and America West. America West's stock closed down 3/8ths, from $28 3/4 on July 17 to $28 3/8 on July 20.

The market's collective yawn to the allegedly material news is fatal to plaintiffs' ability to successfully establish the reliance element of their cause of action when their complaint is founded upon a "fraud-on-the-market" theory. The majority's analysis is contrary to what the Supreme Court and our sister circuits have said in similar cases.

## II

In *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), the Supreme Court adopted for Section 10(b) and Rule 10b–5 claims, the materiality standard articulated in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). Under *Basic*, an omitted fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." 485 U.S. at 231–32, 108 S.Ct. 978 (internal quotation marks omitted).

*Basic* also considered another required element of a securities fraud claim: reliance. The Supreme Court adopted the rebuttable presumption created by the fraud-on-the-market theory. *Id.* at 243–49, 108 S.Ct. 978. The premise of this theory is that in a modern and efficient securities market, the market price of a stock incorporates all available public information. *Id.* at 246–47, 108 S.Ct. 978. Therefore, any person who trades shares relies on the integrity of the market price. *Id.* at 246, 108 S.Ct. 978. Because of this, the Supreme Court created a rebuttable

presumption of reliance by plaintiffs who traded stock while that stock's price reflected inaccurate information. *Id.* at 248. *Basic* cited with approval the test laid out by the Sixth Circuit:

> [I]n order to invoke the [fraud-on-the-market] presumption, a plaintiff must allege and prove: (1) that the defendant made public misrepresentations; (2) *that the misrepresentations were material;* (3) that the shares were traded on an efficient market; (4) *that the misrepresentation would induce a reasonable, relying investor to misjudge the value of the shares;* and (5) that the plaintiff traded the shares between the time the misrepresentations were made and the time the truth was revealed. . . .
>
> *Given today's decision regarding the definition of materiality as to preliminary merger discussions, elements (2) and (4) may collapse into one.*

*Id.* at 248 n. 27, 108 S.Ct. 978 (emphasis added and citation omitted). The Sixth Circuit test contemplates that, to invoke the fraud-on-the-market theory, a reasonable investor would have misjudged the value of the shares. How a reasonable investor would judge a stock's value based on misinformation "collapse[s]" into the reasonable investor standard for materiality. They are not separate and unrelated concepts in securities law. Though *Basic* refused in the pre-merger context to formulate bright-line tests for materiality, the Supreme Court obviously understood the common-sense relationships between materiality, reliance, market value, and market price.

These relationships have not been ignored by our sister circuits. The Third Circuit has held that in an efficient market, the concept of materiality "translates into information that alters the price of the firm's stock." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d

Cir.1997). The Third Circuit observed that since "efficient markets are those in which information important to reasonable investors ... is immediately incorporated into stock prices," information not important to reasonable investors "will have a negligible effect on the stock price." *Id.; see also Oran v. Stafford,* 226 F.3d 275, 282 (3d Cir.2000) (following *Burlington* and holding that "when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock.").

The Fifth Circuit—also following the analysis in *Basic*—has elaborated that the Third Circuit's *requirement* that the misrepresentation affect the stock price is more properly rooted in the reliance element of stock fraud than the materiality element. *Nathenson v. Zonagen Inc.,* 267 F.3d 400, 415 (5th Cir.2001). Though grounded in reliance, the Fifth Circuit still requires a showing that the misrepresentation affected a stock's price in fraud-on-the-market cases. *ABC Arbitrage Plaintiffs Group v. Tchuruk,* 291 F.3d 336, 361 (5th Cir.2002).

The First Circuit, also recognizing that *Basic* employed the fraud-on-the-market theory only for reliance, has nonetheless found that in such cases the failure of the market to react to previously undisclosed information also controls the materiality inquiry:

> This presumption of investor reliance on the integrity of stock prices has the primary effect of obviating the need for plaintiff purchasers to plead individual reliance. But by its underlying rationale, the presumption also shifts the critical focus of the materiality inquiry. In a fraud-on-the-market case the hypothetical "reasonable investor," by reference to whom materiality is gauged, must be "the market" itself, because it is the market, not any single investor, that determines the price of a publicly traded security.

*Shaw v. Digital Equipment Corp.,* 82 F.3d 1194, 1218 (1st Cir.1996).

These cases are instructive. The Fifth Circuit's placement of the stock price in the context of reliance more faithfully follows the Supreme Court's decision in *Basic.* Indeed, the fraud-on-the-market theory is premised on the fact that a misrepresentation has affected the stock's price incongruently to the stock's true "value." 485 U.S. at 246–47, 108 S.Ct. 978. Only then is detrimental reliance presumed because a plaintiff traded stock relying on the integrity of the market price. But if information later revealed does not significantly affect a stock's price, it follows that there was no difference between the stock's price and the stock's true value at the time of the misrepresentation. There is then no reliance causing injury. Under these circumstances, as the Fifth Circuit has held, the failure of newly released information to change stock prices prevents recovery for plaintiffs in a fraud-on-the-market case. *Nathenson,* 267 F.3d at 415.

Stock price changes—or lack thereof—are also relevant to the determination of materiality. As the First and Third Circuits have recognized, the fact that a stock price does or does not change is interconnected with the materiality analysis in fraud-on-the-market cases. The *Basic* materiality test asks what a reasonable investor would consider significant; the market demonstrates the reactions of reasonable investors. At a minimum, the static or dynamic nature of a stock price after the disclosure of previously withheld information is strong evidence of how reasonable investors view the significance of the information.

To successfully plead a securities fraud claim under the fraud-on-the-market theory, a plaintiff must establish that: (1) a defendant made a material misrepresentation of fact; (2) which affected a stock's market price; and (3) the plaintiff detrimentally traded the stock during the period in which the stock's price reflected the material misrepresentation. Evidence of whether a stock price significantly changes following the disclosure of alleged previously misrepresented facts is relevant to two required elements in stock fraud causes of action. In fraud-on-the-market cases, the failure of a stock's price to significantly change following disclosure eliminates the reliance presumption. *Nathenson*, 267 F.3d at 415; *see also Basic*, 485 U.S. at 243–49, 108 S.Ct. 978. Unless other facts supporting reliance are pled, a claim relying on the fraud-on-the-market presumption fails unless the stock price reacts to the information when it is finally disclosed.

No significant change in the stock price is also strong evidence that the information was immaterial. Conversely, the fact that a firm's stock price does significantly change is strong evidence of materiality. *Cf. In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir.1989) ("Dramatic [stock] price movements in response to an optimistic statement would provide a strong indication that the statement itself was material. . . .").

## III

The district court was right to dismiss the complaint before us. There is no question that plaintiffs relied on the fraud-on-the-market theory to establish reliance. The plaintiffs allege in their complaint that America West's stock is traded *"in an efficient market* on the New York Stock Exchange" and that "Class members were damaged [because] *[i]n reliance on the integrity of the market,* they paid artificially inflated prices for America West stock." [1] (emphasis added). There is simply no dispute that, following the public disclosure of the information that is now alleged to have been withheld, America West's stock price did not significantly move in reaction to the news.

The plaintiffs' complaint fails to plead sufficient facts establishing both reliance and materiality. Regarding the reliance element, the plaintiffs here cannot invoke the fraud-on-the-market theory since the information America West allegedly withheld did not affect America West's stock price when it was revealed to the market. The plaintiffs suffered no detrimental reliance since the alleged misrepresentations did not skew the stock price in relation to the stock's true value. The plaintiffs have not alleged any other theory of reliance other than the fraud-on-the-market theory. Therefore, their claims fail as a matter of law.

1. In light of these allegations, which we must construe as true for purposes of a motion to dismiss, I am at a loss to understand what evidence the majority employs to discount the non-reaction of the market because the "market is subject to distortions." What distortions? The plaintiffs have not alleged any, and in fact have alleged the opposite in order to invoke the fraud-on-the-market theory. A vital premise to the fraud-on-the-market theory is the efficient nature of the marketplace. While surely a plaintiff in some other case might allege facts that would show distortions in the market preventing the efficient dissemination of information to investors, and thus lessen the significance of any consistency, or inconsistency, in stock price, the plaintiffs here have not. In fact, even the majority's invocation of a quote from *Basic* regarding a "free and open public market" stands for *exactly the opposite* proposition for which the majority quotes it. *See* 485 U.S. at 245–46, 108 S.Ct. 978.

Similarly, the fact that the stock price did not significantly change undermines the plaintiffs' allegation that the misrepresentations were material. Examining how the market reacted is at least telling of what a reasonable investor would consider significant.

The plaintiffs do, however, assert that the third-quarter shortfall and consequential price drop in September 1998 more accurately reflect the materiality of the alleged misrepresentations. They also claim that contemporaneous statements made by America West officers at the time the information was revealed explains the market's failure to react to the allegedly material news.

While we are required to draw all inferences in favor of plaintiffs for purposes of a motion to dismiss, under the Reform Act the burden remains on the plaintiffs to plead with specificity the facts showing a materially misleading statement. 15 U.S.C. § 78u–4(b)(1)–(2). The plaintiffs here have not alleged with specificity facts that would support the inferences the plaintiffs ask us to draw.

What the plaintiffs fail to show is any causal connection between the FAA investigation and fine and the poor third-quarter performance. How do we know that the settlement affected or caused the operational problems and the third-quarter shortfall? The plaintiffs allege that the settlement forced America West to "spend millions" in corrective measures, which caused the third-quarter shortfall. This is not what the settlement agreement states.

Furthermore, plaintiffs have not shown when, where, or why these millions were spent, let alone how these millions accounted for the depressed profits in the third quarter. America West had been warning investors that its performance could be materially impacted by ongoing and serious labor unrest, yet plaintiffs cannot present any facts demonstrating that these warnings were false and must have served as a convenient cover-up for the alleged real cause of the shortfall: maintenance problems and the FAA settlement. Since these questions are left unanswered by the complaint, we cannot under the Reform Act simply give the plaintiffs the benefit of the doubt and view the market's reaction in September as indicative of the materiality of the misleading statements regarding the FAA investigation and settlement.

Nor is the majority's attempt to explain away the failure of the stock price to drop by focusing on the contemporaneous statements released by America West sufficient to mend this pleading deficiency. The majority blames America West for stating that the FAA settlement would not affect operational performance as the cause for the failure of the stock price to drop. This might have some validity if the plaintiffs had properly shown the link between the FAA settlement and third-quarter profitability. In fact, plaintiffs have not even alleged with any specificity that these statements made by America West after the settlement were false. Therefore, how can one conclude that it is proper to excuse the failure of the market to react in this case? See Oran, 226 F.3d at 283 (rejecting a similar contention that the defendants' contemporaneous statements with the newly released information explained the failure of the stock price to respond to the allegedly material information).

The plaintiffs' other allegations regarding materiality do not meet the Reform Act's standards. The misleading statements that are at the core of this case concern the FAA's investigation into America West's maintenance programs. There is little in the complaint to suggest that this information, if revealed, would have "significantly altered the total mix of information available" to a reasonable in-

vestor in this huge corporation. *Basic,* 485 U.S. at 231–32, 108 S.Ct. 978. The plaintiffs have not sufficiently explained why or how the FAA investigation and settlement is significant enough to alter the views of reasonable investors. The market's non-responsiveness further supports this conclusion: plaintiffs cannot show importance to a reasonable investor because, in the market, reasonable investors cared little about the FAA fine and settlement.

## IV

There is no doubt that in this post-Enron era suspicions have been raised regarding corporate malfeasance and insider trading. But the law is the law. Under the Reform Act, the burden to plead facts with particularity establishing the required element of materiality remains squarely on plaintiffs. Plaintiffs also maintain the burden to plead detrimental reliance. These pleading standards have not been met here. The district court properly dismissed the second amended complaint. I respectfully dissent.