## In re ENTROPIN, INC. SECURITIES LITIGATION

### No. CV04 6180 RC.

United States District Court,
C.D. California.

May 3, 2007.

Jim T. Tice, Kenneth J. Catanzarite, Catanzarite Law Offices, Anaheim, CA, Laurence M. Rosen, Phillip Kim, Rosen Law Firm, New York City, for Plaintiff.

David Zallar, Pro se.

James L. Goldman, Pircher Nichols & Meeks, Los Angeles, CA, Paris Wynn, Robert B. Hubbell, Heller Ehrman White & McAuliffe, Los Angeles, CA, for Defendant.

### CIVIL MINUTES—GENERAL

CHAPMAN, United States Magistrate Judge.

**PROCEEDINGS: ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY**

On November 6, 2006, individual defendants Higgins D. Bailey and Thomas G. Tachovsky filed a notice of motion and motion for summary judgment, a supporting memorandum of points and authorities, the supporting declarations of Paris A. Wynn, Higgins D. Bailey, and Thomas G. Tachovsky, and a statement of undisputed facts and conclusions of law, with exhibits. On December 11, 2006, defendant Entropin, Inc. filed a notice of motion and motion of joinder in the individual defendants' motion for summary judgment and the supporting declaration of Alan S. Petlak, with exhibits, and lodged a separate state-

ment of undisputed material facts. On February 28, 2007, plaintiffs filed an opposition to defendants' motion for summary judgment, a supporting memorandum of points and authorities, the opposing declarations of Eldred Giefer and Laurence Rosen, with exhibits, and an opposing separate statement of disputed and undisputed material facts. On March 26, 2007, the individual defendants and defendant Entropin filed replies and responses to plaintiffs' opposing separate statement of facts, and individual defendants filed the supplemental declaration of Paris A. Wynn, with exhibits, and defendant Entropin filed objections to the declaration of Mr. Rosen and the supplemental declaration of Alan S. Petlak, with exhibits. Finally, on April 13, 2007, plaintiffs filed a response to defendant Entropin's evidentiary objections, the declaration of Phillip Kim, with exhibits, and the amended declaration of Mr. Rosen, with exhibits.[1]

Oral argument was held on May 3, 2007, before Magistrate Judge Rosalyn M. Chapman. Laurence Rosen, attorney-at-law with Rosen Law Firm, and Jim T. Tice, attorney-at-law with Catanzarite Law Corporation, appeared on behalf of plaintiffs, Jerry L. Marks and Cristine Reynaert, attorneys-at-law with the firm Heller Ehrman, appeared on behalf of defendants Bailey and Tachovsky, and James Goldman and Alan S. Petlak, attorneys-at-law with the firm Pircher, Nichols & Meeks, appeared on behalf of defendant Entropin.

## BACKGROUND

### I

On July 28, 2004, several individual plaintiffs, on behalf of themselves and others similarly situated, filed a class action against defendants Entropin, Inc. ("Entropin"), a Delaware corporation whose principal place of business is in this district, Higgins D. Bailey (Entropin's Chairman of the Board of Directors) and Thomas G. Tachovsky (Entropin's Chief Executive Officer) claiming violations of federal securities laws. On December 3, 2004, plaintiffs filed a First Amended Complaint for viola-

---

1. The Court denies the objections of defendant Entropin, all of which relate to the authentication of the exhibits attached to Mr. Rosen's initial declaration, since the recently submitted amended declaration of Mr. Rosen corrects the previous authentication defects. *See, e.g., Orr v. Bank of America, NT & SA,* 285 F.3d 764, 774 (9th Cir.2002) ("A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent."). Moreover, all the other documents (except Exhibit 17) attached to Mr. Rosen's amended declaration were "produced by defendants in this litigation ... during the course of discovery[,]" Declaration of Phillip Kim ("Kim Decl.") ¶ 3; thus, any authentication objection is without merit. *See, e.g., Maljack Prods., Inc. v. Good-Times Home Video Corp.,* 81 F.3d 881, 889 n. 12 (9th Cir.1996) (documents attached to attorney's declaration are properly authenticated when documents were provided by oppos-

ing party who did not contest authenticity and only challenged attorney's ability to authenticate documents); *Anand v. BP West Coast Prods. LLC,* 484 F.Supp.2d 1086, 1090, 1092 n. 11 (C.D.Cal.2007) ("Documents produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating and constitute the admissions of a party opponent."); *In re Homestore.com, Inc. Sec. Litigation,* 347 F.Supp.2d 769, 781 (C.D.Cal.2004) (documents produced during the discovery process are deemed authentic when offered by party-opponent). Similarly, Exhibit 17 has been properly authenticated since Steven L. Brown produced this exhibit in response to a deposition subpoena, Kim Decl. ¶¶ 7–8, Exhs. 1–2, and defendants merely challenge Mr. Rosen's ability to authenticate the document. *See* 31 C. Wright & V. Gold, Federal Practice and Procedure § 7105 at 39 (2000) ("Authentication can also be accomplished through judicial admissions such as stipulations, pleadings, and production of items in response to subpoena or other discovery request.").

tion of federal securities laws, claiming violations of Sections 10(b), 18 and 20 of the Securities and Exchange Act of 1934 ("the Act") and Rule 10b–5 of the Securities and Exchange Commission ("SEC"). On January 31, 2005, Senior District Judge Ronald S.W. Lew denied defendants' motion to dismiss plaintiffs' causes of action under Sections 10(b) and 20 of the Act and SEC's Rule 10b–5, but granted defendants' motion to dismiss plaintiffs' cause of action under Section 18 of the Act. On March 9, 2005, defendants answered the First Amended Complaint and raised several affirmative defenses. The First Amended Complaint is pending.[2]

On February 9, 2006, Judge Lew granted plaintiffs' motion for class certification and appointed W. Douglas Moreland, David E. Lewis, Edwin B. Berrington, David Zallar and Thomas Murphy as class representatives. The certified class consists of "all persons and entities who acquired Entropin, Inc. 'Units' (consisting of one share of common stock and one warrant) in a public offering at $7.25 per Unit on or about March 15, 2000, excluding the defendants, members of their families and any entity in which a defendant has a controlling interest...." Order Certifying the Class and Appointing Class Representatives at 4:7–12.

## II

The parties' undisputed summary judgment documents establish the following

facts: In July 1992, defendant Higgins D. Bailey joined defendant Entropin,[3] where he served as Chief Executive Officer ("CEO") and President before becoming Chairman of the Board of Directors, a position he held until May 2005.[4] Declaration of Higgins D. Bailey ("Bailey Decl.") ¶ 1. Defendant Thomas G. Tachovsky joined Entropin as CEO and President in November 1999, and held those positions until May 2005. Declaration of Thomas G. Tachovsky ("Tachovsky Decl.") ¶ 1. Defendant Tachovsky received a B.S. in biology in 1968 from Gonzaga University, a Ph.D. in microbiology in 1974 from the University of Rochester Medical School and an M.A. in management from Leslie University. Deposition of Thomas G. Tachovsky ("Tachovsky Depo.") at 9:23–10:22. After receiving his Ph.D., and before joining Entropin, defendant Tachovsky was involved in academic drug research and designing clinical drug trials and conducting clinical drug trials. *Id.* at 10:25–12:6, 15:19–16:9, 16:17–22, 17:9–20:10, 21:4–19, 29:11–13.

Between 1992 and 1994, Entropin conducted a Phase II study of the drug Esterom, Entropin's sole product, at the Medical University of South Carolina to determine, among other things, whether Esterom, a topical cream derived from cocaine, was effective in improving restricted range of motion resulting from cast removal (with or without associated pain), a painful shoulder, or an acute back sprain.[5] Depo-

---

**2.** On April 11, 2005, Judge Lew denied defendants' motion for summary judgment on the ground plaintiffs' claims are time-barred. *See also Deveny v. Entropin, Inc.,* 139 Cal.App.4th 408, 42 Cal.Rptr.3d 807 (2006). On April 24, 2006, Judge Lew denied defendants' motion for summary judgment on loss causation, and on April 26, 2006, he denied plaintiffs' motion for a stay pending the state court matter.

**3.** The Court has not been provided with evidence of the date Entropin was incorporated.

**4.** In 1998, defendant Bailey earned a salary of $95,833.00, and in 1999 he was granted stock options valued at $680,000.00. Declaration of P. Wynn ("P. Wynn Decl.") ¶ 12, Exh. K at 198–99.

**5.** "The clinical investigation of a previously untested drug is generally divided into three phases." 21 C.F.R. § 312.21. Phase I studies, which include the initial introduction of an investigational new drug into humans, "may be conducted in patients or normal volunteer

sition of James E. Wynn, Ph.D.("J. Wynn Depo.")[6] at 24:9–27:3; Deposition of Steven L. Brown ("Brown Depo.")[7] at 12:9–17. Dr. James E. Wynn and Lowell Somers, M.D., designed the Phase II study; Dr. Wynn, John B. McGinty, M.D., and Steven L. Brown developed the parameters for the Phase II protocol; Herman E. Jass, Ph.D.,[8] approved the protocol for the Phase II study; Drs. Wynn and McGinty were the primary investigators for the Phase II study; and Mr. Brown helped coordinate the Phase II study. J. Wynn Depo. at 24:9–27:3, 54:10–56:2, 266:3–267:8, 268:3–269:25, 285:5–25, 286:12 287:12; Brown Depo. at 12:18–13:4, 44:19–46:7; Jass Depo. at 6:24–7:7, 10:2–5. The protocol for Entropin's Phase II study, including all amendments, was submitted to the Food and Drug Administration ("FDA") for review, and the FDA permitted Entropin to proceed with the Phase II study. Bailey Decl. ¶¶ 6–7.

On October 2, 1995, defendant Bailey, acting on behalf of defendant Entropin, submitted to the FDA its final clinical and statistical report on the Phase II study of Esterom. P. Wynn Decl. ¶ 11, Exh. J. The Phase II report stated there were six study groups, consisting of a high dose and low dose group (of either Esterom or placebo), for patients suffering impaired range of motion following cast removal or from a painful shoulder or an acute back sprain. *Id.* According to the Phase II report, only two of the six sub-groups—the higher dosage for shoulder pain and acute back sprain—showed efficacy. *Id.* Additionally, at certain dose levels, the placebo was found to be as effective or more effective than Esterom. J. Wynn Depo. at 332:9–333:19. Entropin was allowed to proceed to Phase III even though the FDA was not convinced of Esterom's efficacy. J. Wynn Depo. at 312:24–313:6; Jass Depo. at 23:8–25:24.

On March 9, 2000, defendant Entropin filed a registration statement and prospectus with the SEC in connection with its March 15, 2000, public offering of 2.3 mil-

---

subjects" and "are designed to determine the metabolism and pharmacologic actions of the drug in humans, the side effects associated with increasing doses, and, if possible, to gain early evidence of effectiveness." 21 C.F.R. § 312.21(a). Phase II "includes the controlled clinical studies conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the drug. Phase [II] studies are typically well controlled, closely monitored, and conducted in a relatively small number of patients, usually involving no more than several hundred subjects." 21 C.F.R. § 321.21(b). Phase III studies "usually include from several hundred to several thousand subjects" and "are expanded controlled and uncontrolled trials" that are "performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling." 21 C.F.R. § 312.21(c).

6. Dr. Wynn holds a Ph.D. in medicinal chemistry from the Medical College of Virginia and was on the faculty of the Medical University of South Carolina. P. Wynn Decl. ¶ 12, Exh. K at 196. He was on Entropin's Board of Directors from 1998 to May 2001, Wynn's Depo. at 310:19–311:3, and held almost 500,-000 shares of Entropin stock at the time of the public offering. P. Wynn Decl. ¶ 12, Exh. K at 200. Dr. Wynn sold 200,000 shares of Entropin stock—"100,000 shares at a reasonable price and another 100,000 shares for peanuts." J. Wynn Depo. at 200:6–17.

7. Mr. Brown has a B.S. degree and was on the faculty of the Medical University of South Carolina. Brown Depo. at 6:16–8:7.

8. Dr. Jass was an outside consultant familiar with FDA procedures, who obtained his Ph.D. in chemistry in 1953 from Northwestern University. Deposition of Herman E. Jass ("Jass Depo.") at 7:1–6.

lion shares of Entropin stock and warrants. P. Wynn Decl. ¶ 12, Exh. K. The registration statement was signed by both defendants Bailey and Tachovsky, Bailey Decl. ¶¶ 9–10; Tachovsky Decl. ¶¶ 4–5, and stated:

> We have completed four preclinical animal studies and Phase I and Phase II human clinical trials for Esterom® solution. These trials indicated that Esterom® solution was well tolerated at the dose used. Moreover, the range of motion with patients suffering from shoulder and back conditions **was improved significantly** when compared with patients receiving a placebo. The trials also indicated that Esterom® solution did not appear to have any potential for addiction or abuse. We began Phase III trials for treatment of impaired range of motion due to shoulder injuries and functionality in November 1999. We expect to complete our Phase III trials and submit a new drug application to the FDA in early 2001.
>
>    *    *    *    *    *    *
>
> Our Phase II clinical trial, completed in 1994, was designed to determine the safety and efficacy of Esterom® solution in patients who had impaired range of motion due to acute lower back strain, acute painful shoulder or the removal of a cast. The Phase II clinical trial involved 97 patients, each of whom received two topical applications of Esterom® solution or placebo, with the second treatment applied 24 hours after the first. The results of the trial showed that Esterom® solution provided **statistically significant** improved range of motion in both back and shoulder conditions which was sustained for at least seven days. There was no clinically observed local anesthetic or analgesic effect. The range of motion for each condition was measured by the number of degrees to which the subject could move the affected part in one direction or another. The results for patients who had impaired range of motion resulting from cast removal were inconclusive and we did not pursue this indication further.

P. Wynn Decl. ¶ 12, Exh. K at 1, 15 (emphasis added).

The public offering was at $7.25 per unit, and each unit included one share of common stock and one warrant. Order by Judge Lew dated February 9, 2006. At the time of Entropin's public offering, defendant Bailey owned 1,711,593 shares of Entropin stock, P. Wynn Decl. ¶ 12, Exh. K at 26, and defendant Tachovsky had the right to exercise stock options for 400,000 shares of Entropin stock, none of which were vested at the time of the offering. *Id.* The stock of Entropin's officers and directors, including defendants Bailey and Tachovsky, were subject to a lock-up agreement for one year from the date of the prospectus.[9] *Id.*

## DISCUSSION

### III

Federal Rule of Civil Procedure 56(c) authorizes the granting of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

---

9. Defendant Bailey did not sell any shares of Entropin stock during his tenure at Entropin, and purchased an extra 10,000 shares on October 12, 2000. Bailey Decl. ¶¶ 11–12. Defendant Tachovsky did not sell any shares of Entropin stock during his tenure as Entropin's CEO and President, but he did sell some Entropin stock in May 2005, at a substantial loss for tax purposes. Tachovsky Decl. ¶ 6.

law." The moving party bears the initial burden of identifying the elements of the claim in the pleadings, or other evidence which the moving party "believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *MetroPCS, Inc. v. City & County of San Francisco*, 400 F.3d 715, 720 (9th Cir.2005). The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553; *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir.2005).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 1551–52, 143 L.Ed.2d 731 (1999) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)); *Groh v. Ramirez*, 540 U.S. 551, 562, 124 S.Ct. 1284, 1293, 157 L.Ed.2d 1068 (2004). However, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001) (en banc).

## IV

Section 10(b) of the Act makes it unlawful for any person to directly or indirectly: use or employ, in connection with the purchase or sale of any security registered on a national securities exchange ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. Rule 10b–5, which the SEC promulgated under the authority of Section 10(b), *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014 (9th Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 1335, 164 L.Ed.2d 51 (2006), further provides:

It shall be unlawful for any person, directly or indirectly ... (a) To employ any device, scheme, or artifice to defraud; [¶] (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or [¶] (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

The basic elements of a Rule 10b–5 claim are: (1) *"a material misrepresentation (or omission )"*; (2) *"scienter, i.e.,* a wrongful state of mind"; (3) *"a connection with the purchase or sale of a security"*; (4) *"reliance,* often referred to in cases involving public securities markets (fraud-on-the-market cases) as 'transaction causation'"; (5) *"economic loss"*; and (6) *"'loss causation,' i.e.,* a causal connection between the material misrepresentation and the loss[.]" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S.Ct. 1627, 1631, 161 L.Ed.2d 577 (2005); *In re Daou Sys., Inc.*, 411 F.3d at 1014. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976); *In re Silicon Graphics, Inc. Sec. Litigation*, 183 F.3d 970, 975 (9th Cir.1999). "Knowledge or recklessness is required for a finding of scienter ...,"

*Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1063 (9th Cir.2000); *Vernazza v. Sec. & Exch. Comm'n,* 327 F.3d 851, 860 (9th Cir.2003), *amended by,* 335 F.3d 1096 (9th Cir.2003), which is an essential element of a claim under Section 10(b) of the Act or Rule 10b–5. *Lipton v. Pathogenesis Corp.,* 284 F.3d 1027, 1035 n. 15 (9th Cir.2002); *In re Read–Rite Corp.,* 335 F.3d 843, 845 (9th Cir.2003). Reckless conduct "may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Howard,* 228 F.3d at 1063 (citation omitted).

■ In litigation such as this, "a fact is material if there is a substantial likelihood that a reasonable investor would consider it important in his or her decision making." *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 934 (9th Cir.) (citation and internal quotation marks omitted), *cert. denied,* 540 U.S. 966, 124 S.Ct. 433, 157 L.Ed.2d 311 (2003); *Basic Inc. v. Levinson,* 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Thus, "materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic, Inc.,* 485 U.S. at 240, 108 S.Ct. at 988; *No. 84 Employer–Teamster Joint Council Pension Trust Fund,* 320 F.3d at 934. " 'Materiality and scienter are both fact-specific issues which should ordinarily be left to the trier of fact,' although 'summary judgment may be granted in appropriate cases.' " *Kaplan v. Rose,* 49 F.3d 1363 (9th Cir.), *cert. denied,* 516 U.S. 810, 116 S.Ct. 58, 133 L.Ed.2d 21 (1995); *Howard,* 228 F.3d at 1060; *see also Provenz v. Miller,* 102 F.3d 1478, 1490 (9th Cir.1996) ("[S]ummary judgment on the scienter issue is appropriate *only*

where 'there is no rational basis in the record for concluding that any of the challenged statements was made with [the] requisite scienter.' " (citation omitted; emphasis in original)), *cert. denied,* 522 U.S. 808, 118 S.Ct. 48, 139 L.Ed.2d 14 (1997).

The motion for summary judgment filed by defendants Bailey and Tachovsky addresses only whether they had the requisite scienter to violate Section 10(b) of the Act and Rule 10b–5. Defendants Bailey and Tachovsky claim they did not have the requisite scienter because: they "reasonably and in good faith" relied on Dr. James Wynn to confirm all the representations in the registration statement regarding Entropin's Phase II study and Esterom's efficacy; Dr. Wynn confirmed such statements were accurate; they signed the registration statement in good faith, believing all representatives were true and accurate; and they were not aware any statements were false or misleading. Defendant Entropin claims it did not act with the requiste scienter and all statements in the registration statement were true and not materially misleading.

■ Here, there are material facts in dispute regarding defendants' scienter, and a jury could reasonably find defendants intentionally misrepresented material facts and omitted material information in the registration statement signed by defendants Bailey and Tachovsky. Specifically, a material issue of fact exists whether the registration statement contained material misrepresentations of fact and omitted material information in that, among other things, it stated "the range of motion with patients suffering from shoulder and back conditions was improved significantly when compared with patients receiving a placebo" and the "clinical trial involved 97 patients ... [and t]he results showed that Esterom® solution provided statistically significant improved range of motion in both back and shoulder condi-

tions which was sustained for at least seven days."

Moreover, a material issue of fact exists whether the Phase II study was truly a "double-blind" study, as represented to the FDA and as repeatedly asserted in the registration statement. *See,* e.g., P. Wynn Decl. ¶ 12, Exh. J at ENT 1700 ("The Phase II Study was a double-blinded, randomized, placebo-controlled, and dose comparison ... investigation designed to measure and compare the safety and effectiveness of two applications of Esterom[ ] with two applications of placebo."), ENT 1720 ("Dr. James E. Wynn, one of the Principal Investigator [sic], was the only person with access to the location of the blinding and randomization codes until after the study was finished. He was responsible for the codes [sic] security and confidentiality. The study was unblinded at its conclusion and the data was appropriately analyzed."). Rather, it appears

Dr. Wynn may have "unblinded" the study from the very first patient, Brown Depo. at 50:15–52:12, 53:9–54:24, 81:7–82:23, which clearly had "far-reaching implications." Declaration of Eldred Giefer ("Giefer Decl.") ¶¶ 1–10, Exh. 3. Indeed, an unblinded clinical trial substantially reduces the probability the conclusions drawn from data analysis are valid, " 'is fairly likely to be rejected by the FDA, and will be unconvincing to other informed critics, such as journal readers.' " *Id.* (citation omitted). Yet, none of this information was provided to prospective Entropin investors.

Further, there is a material issue of fact whether defendants Bailey and Tachovsky had actual knowledge of the material misstatements of fact and omissions in the registration statement before they signed it. Initially, plaintiffs have presented evidence defendant Bailey participated in, and was certainly aware of, the decision to unblind the Esterom Phase II study.[10]

---

**10.** Plaintiffs' expert opined on the effects of Dr. Wynn unblinding the study, as follows:

> Dr. Wynn influenced many of the decisions during the analysis phase of this study potentially in a biased way, since he was unblinded. [¶] ... At some point during the analysis, a decision was made that for Shoulder patients, Elevation would be the primary ROM measurement presented in the study report. There is no record of when or by whom this decision was made. It would seem that Dr. Wynn played a primary role in this decision, and did so after reviewing unblinded results. If Internal Rotation or External Rotation had been chosen, the case for efficacy would have disappeared.... Similarly, Flexion was selected as primary for the Back Patients. If Extension or Side motion had been selected, there would have been no case for efficacy for Back patients.... [¶] During the analysis, there were also discussions about which time-point to present as primary. This is another example of a detail that would normally have been decided in an analysis before unblinding the data.... [¶] [In this case, however,] the choice of which time-points would be primary for the study

report had still not been made as of May 1995, yet Medex's unblinded statistical package had been distributed in January 1995. All of the parties involved had seen unblinded results, yet none respected that the decision needed to be made without knowing its consequences.... [¶] The study report gives analyses of Evaluable–Only subgroups of patients equal weight to the analyses of the all patients group. Evaluable–Only can be a useful analysis tool, but the selection of patients must be blinded to remove bias possibilities. However, in April 1994, the evaluability of a known placebo patient was still being debated with full knowledge of the impact of that decision on the analysis. In addition, Medex actually prepared two full sets of results with different grouping of evaluable patients. These were then considered with the full unblinded knowledge of the impact of the choice.... [¶] [Finally,] [t]he fact that data-entry from the CRFs was done by an unblinded person [M. McCallister], is an additional red flag in any assessment of the validity of the analyses.

Giefer Decl. ¶¶ 1–10, Exh. 3 (citations omitted).

*See,* e.g., Amended Rosen Decl. ¶¶ 5hh, Exh. 33 (2/23/94 memorandum from defendant Bailey to Drs. Jass and Wynn regarding Dr. Wynn unblinding the back study due to "suspicions that the backs were not selected properly for entrance into the Phase II study" and noting Dr. Wynn's recommendation for a new Phase II back study); *id.* ¶¶ 5dd, 5gg, Exh. 30 (May 2, 1995 fax from defendant Bailey to Dr. Jass regarding which points to use as primary data points), and Exh. 32 (April 14, 1994 fax from defendant Bailey (and others) to Dr. Jass discussing "[r]emoval of the placebo 'outlier'"—the only patient in the study to experience 100% recovery—to reach a 95% confidence level). Additionally, in 1998, Entropin's advisory scientific committee, with defendant Bailey in attendance, was informed that the Phase II study was inadequate and had to be repeated. Deposition of Gerhard Levy at 12:1–20, 15:7–17:18. Further, Dr. Wynn specifically advised defendant Bailey that, in his opinion, the registration statement should not state 97 people were in the Phase II study because there were three separate groups, each of which was broken down still further, and the registration statement is misleading since it makes it seem that the Phase II efficacy findings were based on more than the "very, very small sample" of eight active patients per group utilized in the Phase II study. J. Wynn Depo. at 311:12–312:9, 351:16–353:16.

Although defendant Bailey claims he relied upon other professionals to perform the Phase II statistical and data analysis, Bailey Decl. ¶ 5; Bailey Depo. of February 1, 2006 ("2/1/06 Bailey Depo.") at 139:24–140:3, a jury may reasonably disagree. Indeed, plaintiffs' evidence suggests that de-fendant Bailey did most of the work on the Phase II protocol, oversaw the progress of the Phase II study, wrote the bulk of the Phase II report, and was involved in the Phase II data analysis and presentation. J. Wynn Depo. at 27:4–15, 43:7–22, 58:10–61:14, 272:14–16, 290:7–291:11, 293:3–25; Deposition of Matthew McCallister ("M. McCallister Depo.") at 108:19–110:6; Jass Depo. at 27:11–13; Amended Rosen Decl. ¶¶ 5cc-dd, ff-gg, Exhs. 29–30, 32–33. Moreover, Dr. Paul Niebergall, whom defendant Bailey states did the initial statistical analysis in the Phase II report, performed only "an informal quick analysis" to determine whether he wanted to use the data in the class he taught. Deposition of Paul Niebergall ("Niebergall Depo.") at 24:14–27:25, 29:24–37:21. Furthermore, since Dr. Niebergall reviewed only a subset of the Esterom clinical data, he was unable to offer an opinion whether Esterom was an effective medication. *Id.* at 37:12–21. Similarly, although defendant Bailey stated Dr. Wynn "was pretty competent in statistics himself" and had a "major role" working with the Phase II statistics, Bailey Depo. at 56:16–21, Dr. Wynn claims he is "not a statistician [and] ... certainly [does not] know statistics[,]" and for him to review a statistician's work "would have been like ... reviewing Greek literature." J. Wynn Depo. at 531:20–532:10. Although defendant Bailey supposedly hired Medex Corporation ("Medex") to do a statistical analysis of the Phase II data, Bailey Decl. ¶ 8; J. Wynn Depo. at 46:22–47:6, 49:11–50:21, 291:11–25; Deposition of David McCallister at 35:7–36:16, 39:19–41:18, and the Phase II report listed Medex employees Deborah L. Matour, Ph.D., and W. Stetson Line, as well as Matthew S. McCallister ("M.McCallister"), as its statisticians,[11]

---

11. According to the Phase II report:

The statistician's role was to: (1) quality control and verify all patient data to assure that it was accurately recorded, (2) input the data into the Phase II Study Data Base and quality check with original patient records, (3) verify the statistical model to be used, (4) prepare tables for measuring and reporting on each efficacy and safety measure, (5) verify the statistical methods to

Amended Rosen Decl. ¶ 5z, Exh. 26 at 746, none of these persons admit acting as a statistician on the Phase II study. Deborah Matour, a part-time medical writer at Medex, was not a statistician, and she denies doing any statistical analysis of data generated from the Phase II clinical trial of Esterom. Deposition of Deborah Matour at 8:22–9:5, 12:2–13:24, 15:6–23:4. Similarly, W. Stetson Line, a computer programmer, was not a statistician, and he denies he is qualified to interpret clinical data and was "very surpris[ed]" to learn his work was in the Phase II report. Deposition of W. Stetson Line at 16:1–9, 17:4–29:17, 32:1–37:20. Finally, M. McCallister worked for defendant Bailey in a "clerical" position, "basically doing ... a variety of task-oriented jobs," including "data entry." M. McCallister Depo. at 18:1–20, 33:14–36:3, 83:2–84:13. However, M. McCallister also was not a statistician, and was not qualified to interpret data, to ascertain whether a sample size was large enough, or to know its significance; rather, he ran "rudimentary calculations" he compared to data from the Medex computer program. *Id.* at 36:4–38:17, 48:1–50:1, 80:20–82:9, 91:1–22, 102:14–103:6, 105:8–22, 128:7–11. Thus, this evidence suggests defendants Bailey and Entropin may have had actual knowledge of the material misrepresentations of fact and omissions in the registration statement regarding the Phase II study results and, particularly, the basis of the statistical significance finding, and those misrepresentations and omissions were material and "not trivial, as the efficacy and competitiveness of [Entropin's sole product] was essential to the company's performance." *Kaplan*, 49 F.3d at 1374.

construct statistical confidence levels, and (6) perform the analytical work for presentation and review by the Chief Investigators.

The plaintiffs' expert witnesses and other evidence also suggest defendants Bailey and Entropin may have deliberately manipulated data to falsely show Esterom's efficacy at Phase II. "As a general rule, summary judgment is inappropriate where an expert's testimony supports the non-moving party's case[,]" *Provenz*, 102 F.3d at 1490 (citations omitted), and that is certainly so here. *Kaplan*, 49 F.3d at 1375–80; *In re Biogen Sec. Litigation*, 179 F.R.D. 25, 36 (D.Mass.1997). Specifically, plaintiffs' experts opine that in the Phase II study, "[t]he data collection and analysis methods applied by Entropin were inappropriate, inaccurate, undocumented, misleading, and not according to standard drug development practice." Giefer Decl. ¶¶ 1–10, Exhs. 1–2. The Phase II study protocols also were improper, in that:

A particular ROM measurement should have been chosen as primary, before collecting or analyzing any data. At a minimum, a primary ROM measurement should have been specified for each patient group. The Phase II Study report cites specific measurements as primary, but no documentation can be found that these decisions were made before seeing their impact. In fact, it appears ... Entropin determined which measurements were primary after seeing the p-value results. [¶] ... The statistical analyses applied by Entropin were inappropriate for the following reasons: The number of patients studied is too small to justify the use of Analysis of Variance (ANOVA) methods. The amount of change from baseline for each patient is not calculated properly.... The placebo (untreated) patients are not properly represented in the analyses. These led to inaccurate assessments of efficacy.

Amended Rosen Decl. ¶ 5z, Exh. 26 at 746.

Re-analyses, using proper statistical methods, indicated efficacy was highly unlikely. [¶] ... Various inconsistencies regarding which ROM measurements were to be collected and analyzed exist between the following documents: protocol, sample case forms (complete CRFs were not available), the data listings submitted to FDA, and the study report. [¶] ... Subgroups of patients were created and called 'Evaluable Patients'. Various documents indicate that the inclusion or exclusion of specific patients was decided on the basis of how positive the efficacy case could be made. Analyses of the subgroups were highlighted in the study report, rather than analyses of all patients. [¶] ... Finally, one would expect that some evidence of reviews, version control, quality assurance, and/or audits of the data entry, statistical analysis, and report writing would exist. The general purpose of these documents would be to show that decision made throughout the process were objective and justified, not self-serving. [¶] ... These factors [show] that explorations of the data were repetitively done, with extensive discussion of the results at each step, in order to select a self-serving subset of analyses to be highlighted in the study report.

Giefer Decl. ¶¶ 1–10, Exh. 1; Amended Rosen Decl. ¶ 5v, Exh. 22. Additionally, one of plaintiffs' experts opines:

Based on my examination of the report of the phase II clinical study, the conduct of the study was flawed. The fact that Esterom could be detected in the blood of only three subjects, two of whom were given placebo, suggests that screening for drugs of abuse was inadequate. The fact that evidence of Esterom, which has metabolites that are similar to cocaine, was detected in the urine of some subjects given the placebo strengthens the implication that subject screening was not adequate. There were inclusion/exclusion violations and the treatment groups were not demographically balanced. Most disturbing, however, subjects were selected for disqualification after the data were unblinded. This is a clear violation of both quality and ethical practices.

Amended Rosen Decl. ¶ 5v, Exh. 22. Further, plaintiffs' experts opine that "[t]he data collected in the Entropin Phase II Study [did] not indicate that Esterom, used as in the study, is efficacious for the treatment of impaired range of motion (ROM) for any of the three subgroups at any dose level[.]" Giefer Decl. ¶¶ 1–10, Exhs. 1–2; Amended Rosen Decl. ¶ 5v, Exh. 22.

Finally, although Steven Brown prepared data summaries from the case report forms and provided that information to Dr. Wynn after the conclusion of the Phase II study,[12] with respect to certain patients, plaintiffs' expert opines that the data reported in the Phase II report differed from the data Mr. Brown submitted,[13] Brown Depo. at 44:19–46:16, 176:23–178:11; Giefer Decl. ¶¶ 1–10, Exh. 3, as follows:

Range of Motion (ROM) measurements for the primary analyses reported in the final study report for at least 11 patients are different from those recorded in [Mr. Brown's] worksheets. Therefore,

12. As of December 31, 1997, Entropin "had no full time employees." Amended Rosen Decl. ¶ 5n, Exh. 40.

13. Mr. Brown's data cannot be checked against the original CRFs because Entropin is unable to locate them, Rosen Decl. ¶¶ 3, 5qq Exh. 43, although Dr. Wynn sent Entropin all the CRFs in either 2001 or 2002. 8/5/05 J. Wynn Decl. at 40:17–42:23. Although plaintiffs raise the specter of spoliation, the Court need not address that issue.

they are not the actual values of the ROM measurements made on the patients in the clinic and recorded on the [case report forms ("CRFs")]; either errors were made during the analyses for the report, or data were deliberately changed. Reporting data different from the CRFs, without documenting the reasons why CRFs were changed, would be considered falsification by the FDA.

Giefer Decl. ¶¶ 1–10, Exh. 3 (citations omitted). Plaintiffs' expert further opines that the changes in the clinical data profoundly effected the results of the 2–ml. painful shoulder subgroup in that Mr. Brown's data showed "2 ml Esterom is not effective at either time-point on the first day, [or] at either time-point on the second day, but [is] better than [the] placebo at the final follow-up evaluation"; whereas, the data in the Phase II report shows "2 ml Esterom is not effective at 10 minutes after the first dose, but then is effective at all the following measurements, including the final follow-up evaluation." *Id.*

The plaintiffs have also presented evidence that defendant Tachovsky, who has a strong scientific background, holding a B.S. in biology and a Ph.D. in microbiology and having been involved over several years in designing and conducting clinical drug trials, may have acted recklessly in signing the registration statement. Specifically, defendant Tachovsky acknowledges he reviewed the Phase II report prior to joining Entropin in 1999 and before he signed the registration statement. Tachovsky Depo. at 46:5–23, 57:16–74:22. Thus, plaintiffs have shown that a jury could reasonably find defendant Tachovsky should have been aware of the deficiencies in the Phase II clinical study prior to signing the registration statement, which contained material misrepresentations of fact and omissions. *See Howard*, 228 F.3d at 1063 ("[A]n actor is reckless if he 'had reasonable grounds to believe material facts existed that were misstated or omit-

ted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort.' " (citation omitted)).

Moreover, for the reasons discussed above, plaintiffs have shown that a material issue of fact exists regarding defendant Entropin's scienter of the material misrepresentations of fact and omissions in the registration statement, and even if a jury were to find there was no actual knowledge, it certainly could find reckless conduct on the part of defendant Entropin. *See Nordstrom, Inc. v. Chubb & Son, Inc.,* 54 F.3d 1424, 1435–36 (9th Cir.1995) ("[C]orporate scienter relies heavily on the awareness of the directors and officers[,]" such as defendants Bailey and Tachovsky, "who ... are necessarily aware of the requirements of SEC regulations ... and of the 'danger of misleading buyer and seller.' " (citations omitted)).

Despite the foregoing evidence, defendants contend scienter was negated because defendants Bailey and Tachovsky did not sell their stock in Entropin when they could have realized a substantial profit and defendant Entropin continued to invest in Esterom, citing *In re Worlds of Wonder Sec. Litigation,* 35 F.3d 1407, 1424–25 (9th Cir.1994), *cert. denied,* 516 U.S. 868, 116 S.Ct. 185, 133 L.Ed.2d 123 (1995) and 516 U.S. 909, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995), and *In re Apple Computer Sec. Litigation,* 886 F.2d 1109, 1118 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990), to support their contention. However, these cases are inapposite for several reasons. First, plaintiffs have produced direct evidence of defendants' actual knowledge. Second, it is undisputed that the stock of Entropin's officers and directors, including defendants Bailey and Tachovsky, were subject to a lock-up agreement for one year from the date of the prospectus, P.

Wynn Decl. ¶ 12, Exh. K at 26, or until March 2001, well after Entropin stock had plummeted following the announcement that Entropin's Phase IIIA study had not shown efficacy. Defendants' Undisputed Facts nos. 54–55. Therefore, individual defendants' failure to sell Entropin stock, and Entropin's continued funding of Esterom, are not sufficient evidence for the Court to find that defendants did not have scienter. *See No. 84 Employer–Teamster Joint Council Pension Trust Fund,* 320 F.3d at 944 ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period. In other words, the lack of stock sales by a defendant is not dispositive of scienter." (citations omitted)); *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 507 (9th Cir.1992) (defendant corporation's continued investment of millions of dollars in its product and corporate officers' failure to sell their stock during the class period does not negate evidence of scienter plaintiff produced and, therefore, there was a genuine issue of material fact regarding scienter precluding summary judgment); *Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1191 n. 12 (10th Cir.2003) (declining to negate scienter or infer lack of motive to defraud from fact defendants did not sell their stock).

For the foregoing reasons, there are genuine issues of material facts in dispute regarding materiality and scienter on plaintiffs' claims under Section 10(b) of the Act and Rule 10(b)(5) that preclude the granting of defendants' motions for summary judgment since a jury could reasonably conclude that reasonable investors reading the registration statement could

have been misled about the nature of an investment in Entropin. *Kaplan,* 49 F.3d at 1373–74; *In re Immune Response Sec. Litigation,* 375 F.Supp.2d 983, 1022 (S.D.Cal.2005).

## V

■■■ Section 20(a) of the Act "provides joint and several liability for controlling persons who aid and abet violations of the 1934 Act absent a finding of good faith and lack of inducement." *No. 84 Employer–Teamster Joint Council Pension Trust Fund,* 320 F.3d at 945.[14] "To establish 'controlling person' liability, the plaintiff[s] must show that a primary violation was committed and that the defendant[s] 'directly or indirectly' controlled the violator." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,* 96 F.3d 1151, 1161 (9th Cir.1996); *Hollinger,* 914 F.2d at 1575. "Whether [a defendant] is a controlling person 'is an intensely factual question,' involving scrutiny of the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan,* 49 F.3d at 1382 (citation omitted); *Howard,* 228 F.3d at 1065. An officer or director " 'is not automatically liable as a controlling person,' although [officer or] director status is a 'red light' to the court." *Kaplan,* 49 F.3d at 1382 (citation omitted); *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1396–97 (9th Cir.1993). "If the plaintiff establishes that the defendant is a 'controlling person,' then the defendant bears the burden of proving he 'acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.' " *Paracor Fin.,*

14. Section 20(a) provides:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a).

*Inc.*, 96 F.3d at 1161 (citations omitted); *Kaplan*, 49 F.3d at 1382–83. Good faith can be demonstrated if the defendants " 'can show no scienter and an effective lack of participation.' " *No. 84 Employer–Teamster Joint Council Pension Trust Fund*, 320 F.3d at 945; *Howard*, 228 F.3d at 1065.

The defendants argue they are not liable under Section 20(a) of the Act because there is no primary violation and they acted in good faith. However, since the Court finds material issues of fact regarding defendants' scienter prevent summary judgment in defendants' favor on plaintiffs' Section 10(b) and Rule 10b–5 claims, defendants are not entitled to summary judgment on the issue of whether a primary violation occurred. *Howard*, 228 F.3d at 1066; *Paracor Fin., Inc.*, 96 F.3d at 1161–62. *Cf. Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir.1999) ("To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act."). Moreover, "because [defendants] cannot show an undisputed lack of scienter, [they] cannot show that [they] acted in good faith[,]" *Howard*, 228 F.3d at 1066; *Arthur Children's Trust*, 994 F.2d at 1398, and they are not entitled to summary judgment on plaintiffs' Section 20(a) claim.

## ORDER

The motions for summary judgment filed by defendants Entropin, Inc., Higgins D. Bailey and Thomas G. Tachovsky **ARE DENIED**.